JOHN HOPSON'S APPEAL FROM COUNTY COMMISSIONERS.

Second Judicial District, Norwich, October Term, 1894. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The liquor license law of this State is a police regulation for the suppression of intemperance, pauperism and crime.

The selection of suitable persons and of suitable places, for the sale of spirituous and intoxicating liquors, is confided to the county commissioners, an administrative tribunal, in the exercise, under statutory limitations, of their sound discretion and judgment.

This function of selection or licensing is one which, by the practical construction of the Constitution of Connecticut, may be intrusted by the legislature to executive, or to judicial officers.

Chapter 175 of the Public Acts of 1893 authorizing an appeal from the decisions of county commissioners to the Superior Court, makes such an appeal a judicial proceeding in so far that the judgment of the court on the decision appealed from may be reviewed by this court when founded on a misconception of the law regulating such appeals; but the Act does not alter the discretionary nature of the power exercised by the county commissioners, and transferred by the appeal to a judge of the Superior Court.

An appeal to this court, therefore, which merely assigns error by the trial judge in the admission and rejection of testimony, as bearing upon the suitability of the place in question, must be dismissed; as the technical rules respecting the production and admissibility of evidence do not apply to such hearings.

[Submitted on briefs October 18th—decided November 28th, 1894.]

APPEAL from the decision of the County Commissioners of New London County in granting a license to sell liquor to one Morrissey; taken to the Superior Court in New London County and tried by *George W. Wheeler, J.;* facts found and judgment rendered reversing the action of the County Commissioners and revoking the license granted, and

appeal by Morrissey for alleged errors in the rulings of the judge. *Appeal dismissed.*

On the presentation of the evidence for the applicant his witnesses were inquired of as to their opinion upon the suitableness of the place; thereafter the remonstrant, Hopson, was examined as follows:—

" *Q.* Do you regard that a suitable place for a saloon ?

" *By Mr. Perkins :* I object to his giving an opinion on that point, and claim that the witness should state facts.

" *By the Court :* You may state whether it is a suitable place or not, and then give your reasons.

" *Witness :* I have been in business for myself as a manufacturer, for fifteen years, and had been in manufacturing establishments before that for some years ; and it is my experience that the proximity—

" *By Mr. Perkins :* I object to this man's experience, and I claim that his testimony should be in regard to facts in connection with this particular place or men."

The court overruled the objection, and the applicant duly excepted.

*Ans.* " My experience is, a saloon located with reference to manufacturing works of this description—as near as this Morrissey saloon is to us—is detrimental; we consider a license to sell liquor in this saloon a positive damage to us. It has been my experience in other concerns, that no other one thing was so detrimental to the successful prosecution of the manufacturing works, or to the discipline of the men, as a liquor saloon located near by."

The witness Morgan offered by the remonstrant was questioned, as appears by stenographer's notes, as follows:—

" *Q.* Will you state why you consider it unsuitable? *Ans.* In the first place a saloon is a menace to any manufacturing property, and this saloon is immediately opposite my property.

" *Q.* Right across the street? *Ans.* Diagonally across the street, and accessible to my men ; and there are various ways for leaving the works under cover of what may be upon the property, of different kinds—piles of lumber, piles

of rock and stone, and many other things which are stored there for general purposes.

" *Q.* Are you talking of what you fear might happen? *Ans.* No, I am talking from personal experience and observation ; and several instances are those of recent experience, where I have discharged men that I have employed a good many years.

" *Q.* I want to know whether you had any trouble with your men from this place, when it was a saloon before? *Ans.* Yes, sir.

" *By Mr. Perkins :* I object to that as not being material to this question. Objection overruled by the court.

" *Q.* I want to know whether you had any trouble with your men when there was a saloon at this place before? *Ans.* Yes, sir ; whenever there is a saloon there we have difficulty."

The witness Morgan, proprietor of the said Morgan Iron Works, was upon his direct examination questioned as follows :—

" *Q.* What effect do you think the location of the saloon at this place would have upon your property? *Ans.* I consider it is a positive damage of ten per cent to the property."

On cross-examination the witness was examined as follows :—

" *Q.* I am asking for a sum corresponding to a ten per cent damage, etc. * * * Now will you give me the sum in dollars that you consider the damage would be? *Ans.* Well, call it three thousand dollars. * * *

" *Q.* What was the profit for the last year's business of your plant?

" *Mr. Brandegee :* I object.

" *By the Court :* I do not believe we will go into the matter quite as much as that, Mr. Perkins ; you can ask the question, if you want to, whether the profits of his business since the saloon was there, are less than they were before, or whether the profits when the saloon was there, were less. Objection sustained.

" *Q.* What is the net per cent of profits per year of your plant? *Ans.* I decline to state.

" *By the Court:* That is excluded. Exception noted. I said the question had already been excluded, and that is the same question you asked before.

" *By Mr. Perkins :* My reason for asking the question is solely because in cross-examination upon this witness stand he has made the statement that his loss for the ensuing year, by reason of the location of the saloon there, would be three thousand dollars."

The witness Williams, offered by the remonstrant, having testified that the place was not suitable, and that he was in the real estate business, was asked by the remonstrant on his direct examination, and inquired of as follows:—

" *Q.* For what reason would it affect the manufacturing concerns? *Ans.* I should think that a drinking place located near a manufactory, where the men could run out and get drinks—

" *By Mr. Perkins :* I object, if the court please; this witness cannot testify to facts outside of his own knowledge ; he said he is not interested in manufacturing, and he said : ' I should think where men could run out,' etc. Objection overruled, and the applicant duly excepted."

*Witness continuing,* " I should think it would be a menace to any manufacturing concern, or to any neighborhood or property."

*Donald G. Perkins*, for the appellant (Morrissey).

*Tracy Waller*, for the appellee (Hopson).

HAMERSLEY, J.   In the preceding case of *Smith's Appeal* we held that a " suitable person " to receive a license to sell liquors under the provisions of § 3053 of the General Statutes, is a person who is shown to the licensing authority to be suited or adapted to the orderly conduct of a business which the law regards as dangerous to public welfare unless conducted by a carefully selected person duly licensed, and

that the fitness of the man to the legal requirement must of necessity in each case be determined, in view of the statutory regulations, by the licensing authority in the exercise of its best judgment. The term "suitable place," as designating a place adapted to the sale of liquors by such licensee, is used in the same section with a similar meaning, and the suitability of such place must be determined by the licensing authority in a similar manner. *Batters* v. *Dunning*, 49 Conn., 480. The appellant's claim of error in the exercise of its judgment by the court below in determining the suitability of the place in question, if the assigning of such error can support an appeal to this court, is disposed of by these cases.

The appellant also assigns error in the admission and rejection of testimony by the court below. Apparently the errors assigned would not, if properly before us, furnish ground for a new trial; but we do not pass upon these questions, because we are of opinion that an appeal does not lie to this court from a judgment of the Superior Court for the correction of such errors as are assigned in this appeal.

The license law of 1872, as developed by amendments into its present form, may be regarded to a limited extent as a revenue act; but its real and substantial characteristics are those of a police regulation made in the exercise of the police powers of the State, to establish regulations appropriate for the preservation of public order, and the protection and promotion of public health and morals. In sustaining the constitutionality of the prohibitory statute of 1854, this court said: "The object of the legislature in passing it, was to aid in the suppression of intemperance, pauperism and crime; evils which impose very heavy and onerous burdens upon the public. The expenses attending the prosecution of crimes, the support of criminals, and the maintenance of paupers are very great; and no one can doubt but that to a very great extent, they have been caused by the multitude of tippling shops with which our community has been heretofore infested." *State* v. *Brennan's Liquors*, 25 Conn., 288.

The failure of such legislation to accomplish its object, induced the legislature to change the policy of prohibition to the policy of restriction, but its object remained the same. The main and controlling feature of the new policy consisted in provisions for the selection of persons suited to conduct the business of selling liquors in compliance with statutory regulations, and fitted to perform the *quasi* public duties which an acceptance of the special privileges granted involved. The duty of making such selection was imposed on county commissioners, an administrative and not a judicial tribunal. This power of selection was in its nature a discretionary power, and the only limit placed by the legislature on the exercise of the discretion is found in the provisions forbidding the selection of specified classes of persons. So careful was the legislature to prevent any question as to the absolute nature of this discretion, that in giving to county commissioners the power and prescribing the manner of revoking any license, (a provision liable to be construed as affecting vested rights) it specially provided that such revocation " shall be final and conclusive, and not subject to appeal, review, or revision, by any other tribunal whatever." General Statutes, § 3061.

Experience proved that the power vested in county commissioners was liable to abuse; that occasionally the judicial temper essential to its just exercise was lacking. In order to provide against such occasional abuse, the legislature of 1893 authorized an appeal from the decision of county commissioners to the Superior Court, to be tried by a judge of said court. Public Acts of 1893, p. 319. If the legislation authorizing the appeal brings the matter within the exercise of judicial power, then this court has jurisdiction to correct any error in law committed in the exercise of such judicial power; and in that case we think the statutes regulating procedure should be construed so as to include the proceeding within their operation.

The subject-matter of jurisdiction is the selection, under statutory limitations, of a person suited to perform his part in carrying out a system of police regulation. The essential

function of the selecting tribunal is the giving effect to a police regulation incidentally involving private rights or interests. It is evident that such a function cannot be executed without the use of means that are in their nature, independently of the purpose of their use, executive as well as judicial. We think such a function lies on the border line of the division between executive and judicial power, and that it is competent for the legislature to commit its exercise either to judicial or executive officers, as may be found necessary for the most efficient enforcement of its police regulations; but we do not think it necessary to examine critically the grounds for reaching such a conclusion, for the practice of this State, both before and since the adoption of the Constitution, has treated the licensing of persons for the sale of intoxicating liquors in the execution of police regulations on that subject, as a function both judicial and executive in its nature, and as one which the legislature may properly commit to either department of government, or to both; and has thus settled the true meaning of the constitutional requirement that judicial and executive powers shall each be confided to a separate magistracy, so far as it affects this question. Such a practical construction may safely be accepted, when the theoretical distinction to be drawn by the court must be subtle and doubtful. This question arose in *Beard's Appeal*, 64 Conn., 526; and we held that " the cause became one of a judicial nature, when it was brought before the Superior Court, and as the judgment there rendered was founded on a misconception of the law, it was as much the subject of review as a judgment in any other proceeding." In *Smith's Appeal, supra*, the error assigned was, also, the wrong construction by the court below of the language of the statute; and we held that such error could properly be reviewed on appeal. But in this case the only errors assigned relate to the action of the judge in reaching his conclusion that the place mentioned was not a suitable place. The error so assigned cannot be reviewed on appeal to this court.

The granting of a license is not so exclusively an execu-

tive function that the legislature has no power to confide it
to a court, but it is nevertheless very clear that the function
is different from that of settling disputed rights in the ordi-
nary course of a judicial trial. The technical rules which
bind a court in such a trial have been developed by the exi-
gencies of judicial combats, where each party is entitled *ex
debito justitiæ* to have a judgment in case he maintains the
facts alleged by testimony that must be received or rejected,
and weighed, in strict compliance with the rules established
for the conduct of such combats. But the exercise of the
judicial function involved in the proceeding in question calls
for no such trial. The judge does not preside over a judi-
cial combat as in the trial of a civil action ; he receives aid
in the formation of his personal judgment. The parties be-
fore him may properly attempt to influence that judgment ;
but it must be reached by the judge, not in subordination to
the particular interests of these parties, but in the interests
of the public in whose behalf an appeal to such exercise of
the judicial power is allowed. In reaching his conclusion,
as well as in directing the production of evidence to aid him
in reaching that conclusion, he acts in the exercise of a judi-
cial discretion which is not the subject of review, and which
is essential for certain purposes to the exercise of judicial
power. The discretion should be exercised in accordance
with the appropriate analogies of the rules governing judicial
trials ; but, in the nature of things, the court cannot be
bound in the particular application of such analogies as it is
bound in the application of the strict rules of law in a judi-
cial trial. The instances of the exercise of such discretion
by courts, both in reaching a result and in the methods by
which the needed information is obtained, are familiar.

The Act of 1893, in permitting an appeal from the decis-
ions of county commissioners to the Superior Court, called
into action a judicial function for dealing with such appeal ;
but it did not alter the actual nature or extent of the power
originally vested in the county commissioners for the selec-
tion of proper persons and proper places for the sale of
liquors. The discretion necessary to the exercise of that

power by the county commissioners is, by the appeal, trans-
ferred to the judge of the Superior Court; but there is noth-
ing in the Act which can be construed as attempting to vest
in this court the final exercise of that discretion, or the con-
trol of its exercise by a judge of the Superior Court. In
dealing with such appeal the Superior Court is bound by the
rules of law regulating the conditions on which the discre-
tionary power of selection shall be exercised, such as the
meaning and effect of the language of the regulating stat-
utes, and the acts required by statutory regulations in order
to permit any action on the original application or the ap-
peal. The court is also bound by those fundamental rules
of law that control all exercise of judicial, or *quasi* judicial,
power; it may not, for instance, arbitrarily refuse to hear
any evidence, or to listen to a person entitled to be heard.
The failure of the court to comply with such rules may be
error which this court upon appeal will correct. But in ex-
ercising the duty of determining a suitable person and a
suitable place for the sale of liquors, imposed on the county
commissioners and, by force of the appeal, transferred un-
changed in its nature and extent to a judge of the Superior
Court, the judge is engaged in settling a matter of discre-
tion. In this case, certainly, the court was not engaged in
the trial of " matters of fact in any cause or action " within
the meaning of the statute regulating appeals to this court.

Our conclusion is: The Act of 1872, as now amended, is
an exercise by the legislature of the police power of the State
for the purpose of promoting the suppression of intemper-
ance, pauperism and crime. The controlling feature of the
Act for the accomplishment of this purpose, is the restriction
of the sale of liquor at suitable places, by persons suited to
the orderly conduct of the business, in accordance with the
regulations prescribed by the Act as essential to the accom-
plishment of its object. The selection of such persons and
places is confided to the county commissioners, in the exer-
cise, under statutory limitations, of their sound discretion
and judgment. By the practical construction of our Consti-
tution as settled by the contemporaneous and uniform action

of legislature and courts, the function of such selection or licensing is one within the judicial as well as the executive power, and may be confided by the legislature to executive, or to judicial officers. The Act of 1893 authorizing an appeal from the decisions of the county commissioners to the Superior Court, made such an appeal a judicial proceeding in so far that the judgment of the court confirming or refusing to confirm the decision appealed from may be reviewed by this court when such judgment is founded on a misconception of the law regulating such appeals; but the Act, in transferring to a judge of the Superior Court the power of the county commissioners in the determination of a suitable person and place for the sale of liquors, does not alter the discretionary nature of that power, and therefore an appeal does not lie to this court for the correction of any errors claimed to have been committed by the judge in the lawful exercise of his sound discretion and judgment; and an appeal assigning only such errors must be dismissed, and may be dismissed on motion.

The appeal is dismissed.

In this opinion the other judges concurred.