## STATE OF CONNECTICUT *v.* DOMENIC CLEMENTE

HOUSE, C. J., COTTER, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued December 11, 1973—decision released July 2, 1974

*Charles G. Albom,* for the appellant (defendant).

*Jerrold H. Barnett,* assistant state's attorney, with whom were *Ernest J. Diette, Jr.,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, for the appellee (state).

LOISELLE, J. The defendant was charged with two counts of indecent assault and one count of conspiracy to commit rape, indecent assault, sodomy, robbery with violence and aggravated assault. The case was tried to the court with four companion cases which were tried to a jury. The court found the defendant guilty of the three charges and the defendant appealed.

The facts found by the court relevant to the assignments of error are as follows:[1] The Slumlords, a motorcycle club with chapters in New Haven and Wallingford, held an outdoor party on the evening of April 12, 1969, near Tyler Mill Road in Wallingford. Forty to fifty-five members attended with their girlfriends or wives. Two generators

---

[1] Error was assigned in relation to over 400 paragraphs and subparagraphs of the finding and draft finding. To describe this as a wholesale attack would be an understatement. At oral argument, the defendant's counsel specifically abandoned all assignments of error not covered in the brief. The vast majority of the assignments of error pertaining to the finding, and all of those challenging the facts found by the court, did not receive mention in the defendant's brief, and are considered abandoned. *Labbadia* v. *Bailey,* 152 Conn. 187, 190, 205 A.2d 377. In his statement of facts, counsel for the defendant interwove citations to certain draft findings which also appeared in the assignments of error. While this is not the clearest method for pursuing assignments of error, we surmise that the defendant has intended to preserve his objections to the omission from the finding of thirty-seven different paragraphs or subpara-

provided power for electric lighting and a jukebox. A large bonfire, about six feet high and ten to fifteen feet across, gave off additional light.

The party had been observed by the two female complaining witnesses early in the evening as they drove along Tyler Mill Road. Later in the evening, the two girls met the male complaining witness. Thinking it was a "hippy" party, the three of them drove to Tyler Mill Road in his station wagon. The young man parked his car on the side of Tyler Mill Road, about seventy-five feet or more, in a straight line, from the bonfire. Some of the flood-lights in the trees were between the car and the bonfire. The lights and the fire provided sufficient illumination to allow a clear view from the location of the car of a person on the other side of the road. The young man left the two girls in the car and approached the bonfire. He realized that the group was a motorcycle club rather than a collection of "hippies." After staying there about five minutes, he returned to the car accompanied by two men who insisted that the two girls attend the party. The two men persisted and upon assurance that nothing would happen, all of them walked to the bonfire.

graphs of the draft finding. A fact may be added only if it is shown to be material and admitted or undisputed, and no correction will be made of a finding for the mere purpose of substituting language of counsel for that of the court. Practice Book § 628. In some instances counsel has failed to pursue the error assigned to paragraphs of the finding which conflict with the draft findings he wishes this court to accept. No effort should be made to add facts which are inconsistent with those found without also seeking to strike out the latter. *Gaffney* v. *Pesce,* 144 Conn. 17, 18–19, 126 A.2d 926; *Saunders* v. *Saunders,* 140 Conn. 140, 143, 98 A.2d 815. Applying these established principles, we find no error in the refusal of the trial court to adopt the statements contained in the defendant's draft findings.

Around the fire was a large number of people drinking, swearing and smoking marijuana. Almost all the men present had long hair and beards. Loud noises were made by bullets and firecrackers being thrown into the fire.

The girls were frightened by the appearance, acts and speech of the persons present. After staying at the bonfire for about five minutes and refusing offers of drinks and drugs, they conferred with their companion and agreed that they should leave and that he should follow them to the car about five minutes later so that it would not appear as if they were afraid. The girls returned to the car and locked the doors. About ten minutes later when their young companion returned, accompanied by a group of men, fifteen or twenty people were standing around the car. The tailgate of the station wagon had not been locked and members of the group entered through it, unlocking the car doors. The dome light in the forward portion of the car was ripped out but a second light over the rear deck could not be removed.

No useful purpose would be served by describing what happened in the two or three hours of depravities that followed. Under the threat of knifings and other physical violence, the two girls were the victims of repeated rape, indecent assaults, indecent acts and attempted sodomy. Their male companion was forced to attempt to cover the rear dome light with his hand when he was not also forced to commit indecent assaults on members of this group. He had had a knife in his side at one time and was also struck in the face, resulting in a black eye, a bloody nose and chipped teeth.

Sufficient light existed in the station wagon from various sources, the lights in the trees, the bonfire and the rear dome light, for the faces of the assailants to be discerned. The complaining witnesses could see clearly who was next to them. The defendant was one of the men who forced the girl in the front seat in the first part of the incident to perform an indecent assault. One of the first of these men had threatened to cut her face with a switchblade knife if she did not submit. The defendant also forced the second girl to commit an indecent assault. After the girls had switched positions in the car and during the time the defendant was in the front seat with the second girl, he asked her where she came from. When she replied "Meriden," he said he was also from Meriden and stated that his name was "Dom." During this conversation, the girl who was in the rear seat was directly behind the defendant. She also heard him say to the girl in the front seat that his name was "Dom." The girl in the front seat also remembered the defendant from his physical appearance; he was thin with a thin face and had hair that was shorter than the other men.

The requests to the onlookers by the victims to be helped or to be left alone were ignored. When the group departed in a procession of unlighted vehicles, sometime after two o'clock in the morning of April 13, 1969, someone in the last car dropped the keys to the station wagon on the ground. The three victims then returned to Meriden.

In his appeal, the defendant has assigned as error the rulings of the trial court on his motions for discovery, the denial of the motion to suppress the

in-court identification of the defendant, and the limitation of the scope of direct and cross-examination of witnesses.

The two female complaining witnesses each gave a number of statements to the police. The defendant claims that the court erred in refusing to order production of these statements under § 54-86b of the General Statutes after the girls had testified on direct examination. The state's attorney objected to this request on the ground that the statute was unconstitutional because it governed matters of procedure which by virtue of the state constitution are vested exclusively in the courts. This objection was sustained by the court and formed the basis for the court's denial of each subsequent motion by the defendant for discovery under § 54-86b. A statute cannot be ruled unconstitutional unless its invalidity is established beyond a reasonable doubt. *Kellems* v. *Brown,* 163 Conn. 478, 486, 313 A.2d 53; *Patterson* v. *Dempsey,* 152 Conn. 431, 445, 207 A.2d 739; *Hartford Bridge Co.* v. *Union Ferry Co.,* 29 Conn. 210, 227. The sections of the Connecticut constitution under which this statute must be considered are as follows: "The powers of the government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another," Conn. Const., art. II; "[t]he judicial power of the state shall be vested in a supreme court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law." Conn. Const., art. V § 1. These two sections

of the 1965 constitution are virtually identical to the original provisions of the constitution of 1818.[2] Violations of the separation of powers provision of the constitution may take various forms. Legislative interference with the judicial power may involve imposing nonjudicial duties on the court, a situation considered in *Adams* v. *Rubinow*, 157 Conn. 150, 251 A.2d 49, and *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 37 A. 1080, or may take the form of an attempt of the legislature to exercise a power of the judiciary, e.g., *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 140 A.2d 863, *Heiberger* v. *Clark*, 148 Conn. 177, 169 A.2d 652.

"[T]he General Assembly lacks any power to make rules of administration, practice or procedure which are binding on either the Supreme Court or the Superior Court." *State ex rel. Kelman* v. *Schaffer*, 161 Conn. 522, 529, 290 A.2d 327; *Adams* v. *Rubinow*, supra, 156. The question of whether a statute is substantive or procedural has arisen in a variety of contexts. An analysis of § 54-86b under the separation of powers doctrine cannot blindly apply definitions of these two concepts which were developed for other purposes. Instead, the meaning of "substance" and "procedure" must be considered in the context of the separation of powers provision of the Connecticut constitution. "The words 'substantive' and 'procedural' . . . are not talismanic. Merely calling a legal question by one

---

[2] Article second of the 1965 constitution is identical to the corresponding sections of the constitutions of 1818 and 1955. The previous version of article fifth which appears in both of the earlier constitutions read: "Sec. 1. The judicial power of the state shall be vested in a supreme court of errors, a superior court, and such inferior courts as the general assembly shall, from time to time, ordain and establish: the powers and jurisdiction of which courts shall be defined by law."

or the other does not resolve it otherwise than as a purely authoritarian performance. But they have come to designate in a broad way large and distinctive legal domains within the greater one of the law and to mark, though often indistinctly or with overlapping limits, many divides between such regions. . . . [W]hether a particular situation or issue presents one aspect or the other depends upon how one looks at the matter. As form cannot always be separated from substance in a work of art, so adjective or remedial aspects cannot be parted entirely from substantive ones in these borderland regions." *Guaranty Trust Co.* v. *York*, 326 U.S. 99, 115–16, 65 S. Ct. 1464, 89 L. Ed. 2079 (Rutledge, J., dissenting). Ultimately, every statute passed by the legislature will be reflected in court proceedings. While a test which relies upon the characterization of a statute as substantive or procedural will suffice where a statute neatly fits into one of these categories, the utility of this analysis in the present case is minimal.

The substance-procedure test is merely one way of expressing what areas of the law fall within the sphere of legislative or judicial power under article second of the Connecticut constitution. Since it does not serve to furnish a satisfactory manner of reaching a decision in this case, a second approach must be taken. "While the necessity and right of each department [of the government] to use the means requisite to its unfettered operation, is clear, it is equally clear that when one department not only uses the means appropriate to another, but uses them for the purpose of executing the functions of that other department, it is not in the exercise of its granted power." *Norwalk Street Ry. Co.'s*

*Appeal,* supra, 597. The statement in *Norwalk,* at page 602, that the legislature has the power to govern procedure for the courts in a broad sense,[3] indicates that the evolution in judicial thought as to the content of the judicial function did not cease with that opinion. *Adams* v. *Rubinow,* supra, however, shows that the analytical approach has remained largely the same. *Adams* indicated that the test of constitutionality for a statute which imposed additional duties on a judge of the Superior Court was whether the "duties interfere with the orderly performance by the Superior Court of its judicial functions." *Adams* v. *Rubinow,* supra, 158.

"The judicial power includes such power as the courts, under the English and American systems of jurisprudence, have always exercised in legal and equitable actions." *Bridgeport Public Library & Reading Room* v. *Burroughs Home,* 85 Conn. 309, 320, 82 A. 582. The most basic component of this power is the function of rendering judgment in cases before the court. "An Act of the legislature which opens or vacates a judgment is . . . void . . . because it would invade the judicial prerogative. . . . The judgment is the final and supreme act of judicial power. The legislature cannot overturn judgments, any more than the judiciary can make laws." *State* v. *New York, N.H. & H.R. Co.,* 71 Conn. 43, 49, 40 A. 925. Thus, the broad division between the power of the courts and the power of the legislature can be drawn as follows: "It is the

---

[3] See also *Wilcox* v. *Madison,* 106 Conn. 223, 231, 137 A. 742, appeal dismissed, 276 U.S. 606, 48 S. Ct. 337, 72 L. Ed. 728; *State* v. *Torello,* 103 Conn. 511, 520, 131 A. 429; *Lew* v. *Bray,* 81 Conn. 213, 217, 70 A. 628; *Johnson County Savings Bank* v. *Walker,* 79 Conn. 348, 351–52, 65 A. 132; *Atwood* v. *Buckingham,* 78 Conn. 423, 428, 62 A. 616; *Dawson* v. *Orange,* 78 Conn. 96, 100, 61 A. 101.

province of the legislative department to define rights and prescribe remedies: of the judicial to construe legislative enactments, determine the rights secured thereby, and apply the remedies prescribed." *Atwood* v. *Buckingham,* 78 Conn. 423, 428, 62 A. 616.

As it is used in the separation of powers provision of the constitution, however, the "judicial power" cannot constitute an exclusive grant of every activity in which courts may engage. " 'The rule of separation of [governmental] powers cannot always be rigidly applied.' [Citation omitted.]" *Adams* v. *Rubinow,* 157 Conn. 150, 155, 251 A.2d 49. There are activities in which both the legislature and the judiciary may engage without violating the prohibitions of the constitution. "[The] great functions of government are not divided in any such way that all acts of the nature of the functions of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative, and judicial powers, of necessity overlap each other, and cover many acts which are in their nature common to more than one department. These great functions of government are committed to the different magistracies in all their fullness, and involve many incidental powers necessary to their execution, even though such incidental powers in their intrinsic character belong more naturally to a different department." *In re Application of Clark,* 65 Conn. 17, 38, 31 A. 522; see also *State* v. *Moynahan,* 164 Conn. 560, 569, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219; *Hopson's Appeal,* 65 Conn. 140, 146, 31 A. 531. To be unconstitutional in this context, a statute must not only deal with subject-

matter which is within the judicial power, but it must operate in an area which lies exclusively under the control of the courts.

The rulings and the controversy in this case center around part (a) of § 54-86b.[4] Whatever other characterizations can be made of this statute, from its origin in *Jencks* v. *United States*,[5] 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103, to the addition of chapter 22A, "Discovery in Criminal Cases," to the Practice Book, the principle provided for has been recognized as dealing with discovery.

[4] "[General Statutes] Sec. 54-86b. RIGHT OF ACCUSED TO EXAMINE STATEMENTS. (a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use. (b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

[5] Neither *Jencks* v. *United States*, 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103, nor the subsequent legislation that bears its name, the so-called Jencks Act, 71 Stat. 595, 18 U.S.C. § 3500, were cast in constitutional terms and the principle has never been extended to control criminal trials in state courts. *United States* v. *Augenblick*, 393 U.S. 348, 356, 89 S. Ct. 528, 21 L. Ed. 2d 537. The defendant argues that the *Jencks* principle is a rule of common law. Whether or not this is so, *State* v. *Pikul*, 150 Conn. 195, 187 A.2d 442, shows that it is not a part of the common law of Connecticut. The fact that the Jencks Act, 71 Stat. 595, 18 U.S.C. § 3500, was promulgated by Congress has no bearing on this case. In the federal system of government, the legislative branch has long been held to have the power to make rules of court. *Sibbach* v. *Wilson & Co.*, 312 U.S. 1, 9, 61 S. Ct. 422, 85 L. Ed. 479; *Wayman* v. *Southard*, 23 U.S. (10 Wheat.) 1, 6 L. Ed. 253. In Connecticut, the power to make rules of court was vested in the judiciary under chapter 15 of title 42 of the General Statutes. Statutes, 1808, p. 221. Consequently, the court had rule-making power at the time the constitution of 1818 was adopted.

While civil and criminal discovery are not interchangeable; see *State* v. *Vennard,* 159 Conn. 385, 389, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625; they are sufficiently analogous, for purposes of this discussion, to treat them as equivalent. " 'The power to enforce discovery is one of the original and inherent powers of a court of equity.' *Peyton* v. *Werhane,* 126 Conn. 382, 388, 11 A.2d 800; *Skinner* v. *Judson,* 8 Conn. 528, 533." *Carten* v. *Carten,* 153 Conn. 603, 611, 219 A.2d 711; *Katz* v. *Richman,* 114 Conn. 165, 171, 158 A. 219. Despite the frequent repetition of this statement, statutes purporting to control discovery were part of Connecticut law for many years after the constitution of 1818. 1 Stephenson, Conn. Civ. Proc. (2d Ed.) § 137 (c). Throughout this period, however, the courts also allowed a bill of discovery when a party's remedies at law were inadequate. This was a separate proceeding, independent of promulgated rules of court and statutory enactments, and was regarded as an exercise of the court's inherent equitable powers. *Pottetti* v. *Clifford,* 146 Conn. 252, 262, 150 A.2d 207; 1 Stephenson, op. cit. §§ 142, 143. It is true that this court has indicated that this sort of action could be barred by the legislature; *Peyton* v. *Werhane,* supra, 387; but this viewpoint and any consideration of discovery and the judicial power must be considered in light of the ongoing evolution of judicial principles in the separation of powers area.

Prior to the adoption of the constitution of this state in 1818, all governmental power, including the judicial power, was vested in the General Assembly. Support had already developed for a constitution which would make the legislative, executive and judicial powers independent of each other when, in

1815, the legislature annulled the murder conviction of Peter Lung (*Lung's Case,* 1 Conn. 428) rendered by a special three-judge court in Middletown. This event and Judge Swift's publication of a pamphlet which stressed the dangers of encroachment by the legislature added measurably to the mounting public sentiment for a convention to design a constitution which would incorporate protection for an independent judiciary through a separation of government powers. *Styles* v. *Tyler,* 64 Conn. 432, 448, 30 A. 165.

Shortly after the adoption of the separation of powers provision of the constitution of 1818, the case of *Starr* v. *Pease,* 8 Conn. 541, 548, committed our courts to the doctrine that the constitution was a limitation rather than a grant of powers and that the General Assembly had all powers not expressly allocated to another department. Following this ruling, it was only natural for the General Assembly to assume it had significant sections of judicial power. Its activities in judicial matters are extensively reviewed with approval in *Wheeler's Appeal,* 45 Conn. 306, 315–16. Despite some limiting language in *Brown* v. *O'Connell,* 36 Conn. 432, 446, it was not until *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 37 A. 1080, that *Wheeler's Appeal,* supra, and the doctrine first adopted by *Starr* v. *Pease,* supra, were overruled. "[I]n the *Norwalk* case [69 Conn. 576, 37 A. 1080] it was finally clearly determined that (1) the constitution represented a grant of power from the people, in whom all power originally resided, and (2) the powers granted to the General Assembly are . . . complete except as restricted by the state or federal constitution, just as the judicial powers granted the judicial department are complete except as

restricted by the state or federal constitution. *Patterson* v. *Dempsey,* 152 Conn. 431, 444, 207 A.2d 739." *Adams* v. *Rubinow,* 157 Conn. 150, 154, 251 A.2d 49; *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 231, 140 A.2d 863; *Bridgeport Public Library & Reading Room* v. *Burroughs Home,* 85 Conn. 309, 319, 82 A. 582. The restrictions placed upon the interpretation of statutes under this system were said to be "fundamental to the very existence of constitutional government." *Norwalk Street Ry. Co.'s Appeal,* supra, 593.

This recognition of the judiciary's constitutional power and independence did not cease with the statement in *Norwalk Street Ry. Co.'s Appeal,* supra, 594, that "[o]ne controlling consideration in deciding whether a particular act oversteps the limits of judicial power, is the necessary inconsistency of such acts with the independence of the judicial department, and the preservation of its sphere of action distinct from that of the legislative and executive departments." In 1950 it was further delineated by *In re Appeal of Dattilo,* 136 Conn. 488, 492, 72 A.2d 50, which held that courts have an inherent power, independent of statutory authorization, to prescribe rules to regulate their proceedings and facilitate the administration of justice as they deem necessary. See annots., 158 A.L.R. 705, 110 A.L.R. 23. In more specific terms, this court has also held in reviewing acts of the legislature that the legislature has not the competency to impair the essential nature or jurisdiction of any of the constitutional courts; *Walkinshaw* v. *O'Brien,* 130 Conn. 122, 142, 32 A.2d 547; and that the judiciary has exclusive powers over: (1) a charitable trust, its proper administration, the purposes of the donor and the interests of the beneficiaries; *Hartford* v.

*Larrabee Fund Assn.,* 161 Conn. 312, 318-19, 288 A.2d 71; *Macy* v. *Cunningham,* 140 Conn. 124, 132, 98 A.2d 800; *Bridgeport Public Library & Reading Room* v. *Burroughs Home,* supra, 320-21; and (2) the fixing of qualifications for, as well as the admitting of persons to, the practice of law in the state; *In re Application of Griffiths,* 162 Conn. 249, 252-53, 294 A.2d 281, rev'd (on other grounds), 413 U.S. 717, 93 S. Ct. 2851, 37 L. Ed. 2d 910; *Heiberger* v. *Clark,* 148 Conn. 177, 185, 169 A.2d 652.

It has been the policy of our courts more often than not to defer to the legislature, especially in that indefinable area of power that exists between these two departments of government. In those instances, however, where there was a clear invasion of judicial power by the legislature, these cases illustrate that the courts have not hesitated to step in. This was not done as a manifestation of the court's own power but as a duty imposed by the constitution to keep the three great departments of the government separate. Otherwise, acquiescence to a gradual invasion of the judiciary by the legislature would eventually render the former little more than a judicial staff of the legislature. All pretense of independence would disappear and the judicial power would come to rest again in the hands of the General Assembly as it did prior to the year 1818.

In enacting § 54-86b, the legislature attempted to overrule *State* v. *Pikul,* 150 Conn. 195, 187 A.2d 442, which had rejected the *Jencks* principle urged upon it by the appellant in that case. The court instead stated that after examination of the documents requested, "[i]t is within the discretion of the court to grant or deny a defendant the right to inspect statements of the state's witnesses in the possession

of the state's attorney." *State* v. *Pikul,* supra, 202; see *State* v. *Pambianchi,* 139 Conn. 543, 548, 95 A.2d 695. If § 54-86b is given effect, it would infringe upon the Superior Court in prohibiting its exercise of discretion and in controlling discovery which is within the court's inherent power. Thus there would be an encroachment on both the operational and the structural levels. To allow this would be to reverse the course which this court has set in delineating and guarding the judiciary's exclusive powers. We are compelled to hold § 54-86b unconstitutional as a violation of article second of the Connecticut constitution. The court was not in error in refusing to be bound by the statute and in holding that the defendant and his counsel were to follow the recognized procedures previously referred to if they wished to obtain prior statements of witnesses.

Upon a first reading of the many pages of the record which do not pertain directly to the case before us, it would appear that the defendant was correct in his assignment of error that much of it was irrelevant and should be stricken. Careful analysis reveals that the extensive testimony, colloquy and rulings not directly involved in the defendant's appeal were included in the record to make it absolutely clear that when rulings were made by the court on motions by the defendant's counsel for production of statements by witnesses under § 54-86b, counsel knew the exact significance, scope and extent of the ruling and that counsel was always aware that the ruling by the court in no way was an indication that such statements might not be obtained under the rule of such cases as *State* v. *Pambianchi,* supra, or *Hurley* v. *Connecticut Co.,* 118 Conn. 276, 284, 172 A. 86.

If the defendant's next argument is to be interpreted as a claim that the court erred in not examining the written statements of the witnesses to see if they were relevant and also to see if the defendant might otherwise be entitled to the statement, the extensive record and appendices provide no basis for it. The court repeatedly stated that it would examine such statements for inconsistencies, but all defense counsel stated that they were entitled to the statements as a matter of right under the statute. The court's initial ruling on the statute came early in the trial when counsel for a codefendant made a request under the statute for a prior statement of the witness on the stand. The state's attorney offered the statement to the court to be examined for inconsistencies and counsel stated: "My position is that the record should note my objection to your Honor looking at the statement since Public Act 680 [G.S. § 54-86b] makes no such requirement." The court then expressed its position on the invalidity of the statute and counsel for this defendant stated: "Since this applies to Mr. Clemente, may that exception be accorded to me, too." The ruling set the pattern for further rulings on this issue. On frequent additional occasions the court specifically inquired before ruling whether the request for the statements were solely under the statute and counsel for the defendant replied in the affirmative. The record clearly shows that the defendant moved for production of the prior statements of witnesses solely on the ground of the statute; consequently, he cannot say at this time that the court should have examined the statements to determine if he should have received them under other rules of procedure. *State* v. *Taylor,* 153 Conn. 72, 86, 214 A.2d 362, cert. denied, 384 U.S. 921, 86

S. Ct. 1372, 16 L. Ed. 2d 442; *Tucker* v. *United States,* 375 F.2d 363, 367 (8th Cir.), cert. denied, 389 U.S. 888, 88 S. Ct. 128, 19 L. Ed. 2d 189. The appendix to the defendant's brief indicates that after all the court's rulings on the § 54-86b issue had been made, the defendant's counsel agreed with the statement that the court could look at the statements but they would then be turned over to counsel as a matter of right, regardless of what the court thought of their contents. This statement does nothing to vary the defendant's stance that he was entitled to the statements as a matter of right under § 54-86b, nor does it constitute a request that the court review the documents and order production in its discretion.

The next claim of error is that the out-of-court photographic identification was impermissibly suggestive and constitutionally unfair. During the trial, the court denied a motion to suppress the in-court identifications of the defendant by the complaining witnesses. In its finding, the court concluded that each of the complaining witnesses who identified the defendant did so on the basis of her observation of him on the night of April 12 or the morning of April 13. The court also concluded that the procedure used by the police in the display of photographs to each of the victims was not one which was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification so as to violate *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247. In his brief, counsel for the defendant states that the array "touched the edge" of unfairness and even crossed the line, but that he concludes the brief without further arguing this point to avoid a substantial addition to its length. Ordinarily, on this note, no consideration would be given to this claim.

*Stoner* v. *Stoner,* 163 Conn. 345, 349, 307 A.2d 146. Since identification was a vital issue in this case, however, the matter is reviewed. This claim can apply only to the identifications made by the two female complaining witnesses, since the male complaining witness made no identification of the defendant before or during the trial.

The trial court's conclusions are tested by the finding and are allowed to stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. *Brauer* v. *Freccia,* 159 Conn. 289, 293, 268 A.2d 645; *Johnston Jewels, Ltd.* v. *Leonard,* 156 Conn. 75, 79, 239 A.2d 500. The court made an extensive finding regarding the procedure followed by the police. With minor differences, the Wallingford police followed the same sequence and the same procedure in obtaining pretrial identification of the defendant from each of the female complaining witnesses. At no time were the two girls together while they made their identification. They were not told the names of any suspects nor were any suggestions made by the police. The procedure in each instance was to lay out the photographs at random and ask the victim if she recognized any of the individuals depicted. Photographs for the display were selected by the police on the general description received and also on the basis of membership in the Slumlords of New Haven and Wallingford. No statements were taken from complaining witnesses as to any photograph selected until that selection was made.

Groups of photographs were shown separately to each girl on April 13, 17, 18 or 23, 1969. On April 13, fifteen pictures and a group photograph of the

New Haven Slumlords were displayed. On April 17, forty-eight photographs of single individuals were shown. Each girl initialed the back of all photographs selected on this occasion. One of the girls was also shown a group photograph and a booklet of photographs. At least seven of the forty-eight photographs were "mug" shots taken by the police and from these each of the girls selected a photograph of the defendant. On April 18 or 23, other groups of photographs were displayed for the girls and one of them again selected a photograph of the defendant. Another six "mug" shots were shown to one of the female complaining witnesses on April 30. The other girl surveyed a medium-size group of photographs during the summer of 1969, and once again picked out a photograph of the defendant. The defendant's hair in the photograph selected on that date appeared longer than it was on the night of April 12.

The recited facts are sufficient to demonstrate that the photographic identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons* v. *United States,* supra; *State* v. *Watson,* 165 Conn. 577, 589, 345 A.2d 532; *State* v. *Oliver,* 160 Conn. 85, 93, 273 A.2d 867, cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115.

At the trial it was brought out that during police identification procedures each of the three complaining witnesses had selected a photograph of a man who was in fact in jail at the time of the assaults. This fact went to the issue of the degree of certainty of the identifications made by the witnesses but not to the procedure of photographic

identification. It was for the court to consider this evidence with all the other evidence in the determination of the factual issues of identification.

During the cross-examination of one of the complaining witnesses regarding what she told the police captain, counsel for the defendant attempted to question her concerning the affidavit of the police captain which was attached to the bench warrant. After the state's objection, the court asked whether the questioning was based upon what the police captain had set forth in his affidavit, and counsel replied that it was. The court sustained the state's objection and an exception was noted. The affidavit in question was not an exhibit. "[C]ross-examination as to the contents of a document and questions at least relating to, if not actually involving, the contents of the document should not be permitted unless the writing is in evidence." *Robinson* v. *Faulkner,* 163 Conn. 365, 373, 306 A.2d 857; *Shulman* v. *Shulman,* 150 Conn. 651, 662, 193 A.2d 525; 58 Am. Jur., Witnesses, § 643. Excluding the defendant's questions was not error.

The same rule applies to the defendant's next contention. The defendant claims that the court erred in excluding certain questions asked of the police captain who took statements from the complaining witnesses and who prepared the affidavit attached to the bench warrant. The defendant's counsel attempted to examine the officer on the contents of the affidavit. Since the affidavit was not in evidence, the court was not in error in its ruling.

The defendant has also briefed a second assignment of error regarding the examination of the police captain. In a series of questions, the defendant's counsel attempted to elicit information about

oral statements made by the complaining witnesses to the officer. The prosecution objected to most of these questions and the court sustained almost all of the objections. The effect was to block most of this line of questioning about what the witnesses had said. Under *State* v. *Rivers,* 82 Conn. 454, 459, 74 A. 757, cited by counsel during the trial, an accused is "permitted to show, by questions in proper form . . . [that a complaining witness made statements to another] in conflict with those made by her in her direct testimony." One complaining witness had admitted on the stand that certain portions of her statement to the police were inconsistent with her present testimony. It appears that counsel had no prior knowledge of any other inconsistencies and that the questioning was simply a fishing expedition to explore for other contradictions. Under these circumstances, the court was not in error in sustaining the objections of the prosecution.

The defendant next claims that the court erred in limiting the questioning of the two female complaining witnesses on two additional occasions. The validity of this claim is tested by the finding. Practice Book §§ 630, 635, 648; *Katz* v. *Brandon,* 156 Conn. 521, 538, 245 A.2d 579. The defendant's brief refers to an assignment of error that attacks ten rulings on evidence but the brief addresses itself to only three of these, one of which has already been discussed. The assignment as error of. each of the remaining seven rulings is considered abandoned. *State* v. *Bitting,* 162 Conn. 1, 3, 291 A.2d 240.

During a hearing out of the presence of the jury on a motion to suppress in-court identifications, the defendant's counsel examined one of the complaining witnesses. After she was questioned by two of the

counsel for the other defendants, the defendant's attorney received permission from the court to renew questioning. He asked if she knew at the time she observed the photographs "that the scene of the attack was Tyler Mill Road in Wallingford"; "whether or not it involved a motorcycle club"; and "whether or not the motorcycle club was in Wallingford." The court sustained the prosecution's objections to these three questions and counsel failed to give any reason for asking them. Without further explanation from the defense, the court was correct in ruling at the time of the trial that the questions were immaterial to the issue of photographic identification. The brief now argues that testimony given prior to the excluded questions had indicated there was little illumination at the time of the assaults and consequently the questions were relevant to the ability of the complaining witness to see clearly enough to make an accurate identification of the defendant. As they were stated, the questions asked were not material. If trial counsel intended to show what counsel on appeal now claims, it was his duty to inform the court of his purpose and the grounds therefor at the time of the ruling. Practice Book § 226; *Birgel* v. *Heintz,* 163 Conn. 23, 36, 301 A.2d 249; *Acampora* v. *Ledewitz,* 159 Conn. 377, 381, 269 A.2d 288; *Casalo* v. *Claro,* 147 Conn. 625, 629, 165 A.2d 153.

The remaining ruling assigned as error sustained another objection to a question addressed to one of the complaining witnesses. Counsel for the defendant had asked whether the witness recalled if the light in the rear of the vehicle was on during a particular period of time. After several further questions concerning the rear light, counsel recited what he claimed to be some of her previous testi-

mony on this subject and asked if his summary was correct. The state objected on the basis that the summary was inaccurate. The court sustained the objection, stating: "I think that encompasses more than what my recall is of what she said so I'll sustain it." An exception was taken and no further comment was made.

A trial court has wide discretion as to the scope of cross-examination. *State* v. *Palozie*, 165 Conn. 288, 297, 334 A.2d 468; *State* v. *Keating*, 151 Conn. 592, 597, 200 A.2d 724, cert. denied, sub nom. *Joseph* v. *Connecticut*, 379 U.S. 963, 85 S. Ct. 654, 13 L. Ed. 2d 557. There is no showing in the record that the court was incorrect in its statement. While leading questions may be allowed on cross-examination, "a question may become improper . . . because it may by implication put into the mouth of an unwilling witness, a statement which he never intended to make, and thus incorrectly attribute to him testimony which is not his." 3 Wigmore, Evidence (Chadbourn Rev. 1970) § 780. No error was shown in this ruling.

The remaining assignments of error were not briefed and are considered abandoned. *State* v. *Brown*, 163 Conn. 52, 55, 301 A.2d 547; *Holt-Lock, Inc.* v. *Zoning & Planning Commission*, 161 Conn. 182, 184, 286 A.2d 299.

There is no error.

In this opinion HOUSE, C. J., and MACDONALD, J., concurred.

COTTER, J. (dissenting). It is difficult to perceive how the analysis of the separation of powers issue and the authorities relied upon in the majority opinion support the conclusion that General Statutes

§ 54-86b is an unconstitutional encroachment of an exclusive judicial power. The majority acknowledges the principle that judicial and legislative powers overlap and that " '[i]t is the province of the legislative department to define rights and prescribe remedies: of the judicial to construe legislative enactments, determine the rights secured thereby, and apply the remedies prescribed.' *Atwood* v. *Buckingham,* 78 Conn. 423, 428, 62 A. 616," and states that "[t]o be unconstitutional in this context, a statute must not only deal with subject-matter which is within the judicial power, but it must operate in an area which lies exclusively under the control of the courts." The majority opinion continues: "[S]tatutes purporting to control discovery were part of Connecticut law for many years after the constitution of 1818," citing cases which delineate areas in which the judicial power has been held to be exclusive. Those cases do not relate, however, to discovery or production of documents for cross-examination, the specific issue before us, but, on the contrary, decided, e.g., that the power over the administration of charitable trusts is now exclusively in the judicial department, not an incident of the legislative branch; *Second Ecclesiastical Society* v. *Attorney General,* 133 Conn. 89, 92, 48 A.2d 266; that the appointment of a successor trustee is purely a judicial function; *Macy* v. *Cunningham,* 140 Conn. 124, 132, 98 A.2d 800; that the admission of attorneys is a judicial function not subject to control by the legislature; *Heiberger* v. *Clark,* 148 Conn. 177, 185, 169 A.2d 652; and that the fixing of court fees is clearly a legislative, not a judicial or administrative, function. *Adams* v. *Rubinow,* 157 Conn. 150, 175, 251 A.2d 49. From the foregoing, without attempting to analogize the rationale of these cases

to the statute, § 54-86b, the majority opinion concludes beyond a reasonable doubt that discovery is an exclusive judicial power and, therefore, § 54-86b is unconstitutional as a violation of article second of the Connecticut constitution.

The relevant applicable principles in determining the constitutionality of § 54-86b are clear. One claiming that a legislative enactment is invalid because violative of the constitutional separation of powers must establish its invalidity beyond a reasonable doubt; and a court should make every proper presumption and intendment in favor of the legislation, adopting a construction which will uphold the statute, even though that interpretation may not be the most obvious one. *Adams* v. *Rubinow,* supra, 152–53; *Snyder* v. *Newtown,* 147 Conn. 374, 390, 161 A.2d 770, appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688; 16 Am. Jur. 2d, Constitutional Law, §§ 109, 175. It is beyond the judicial realm to pass upon the necessity and wisdom of any legislative enactment, the court's only duty being to determine whether a statute is within the legislative power and does not contravene any constitutional provision. *Patterson* v. *Dempsey,* 152 Conn. 431, 444–45, 207 A.2d 739; *State ex rel. Higgins* v. *Civil Service Commission,* 139 Conn. 102, 111, 90 A.2d 862.

Discovery was regulated by statute until 1931 when the legislature, inter alia, granted authority to the judges of the Superior Court to effectuate the provisions of the disclosure statute. Public Acts 1931, c. 252, Cum. Sup. 1935, § 1659c.[1] Until now that power of the General Assembly to enact such legislation has never been challenged as either be-

---

[1] For a discussion of the development of discovery in Connecticut, see 1 Stephenson, Conn. Civ. Proc. (2d Ed.) § 137.

yond the legislative domain or in contravention of article second of the Connecticut constitution. This legislative sanction has been continued until the present statute which authorizes the judges of the Supreme Court to "effectuate" the statutory provisions. General Statutes § 52-197.[2] Subsequent to the 1931 delegation by the General Assembly of the power to promulgate discovery rules to the Superior and then the Supreme Court, this court has recognized statutory discovery rules, as well as court rules, as governing the extent of discovery. *Stanley Works* v. *New Britain Redevelopment Agency,* 155 Conn. 86, 93, 230 A.2d 9; *Peyton* v. *Werhane,* 126 Conn. 382, 386-87, 11 A.2d 800; *May* v. *Young,* 125 Conn. 1, 9, 2 A.2d 385. We have said: "It is true that means for the production of evidence and for disclosure generally under our statute and practice afford a measure of relief. See Rev. 1958, §§ 52-143, 52-148, 52-149, 52-152, 52-153, 52-154." *Pottetti* v. *Clifford,* 146 Conn. 252, 262, 150 A.2d 207.

---

[2] The promulgated rules begin at chapter 11, § 72 of the 1934 Practice Book, p. 38, and asterisked to the heading "Disclosures" is a footnote which reads, in part: "*These rules are made under authority given, Gen. Stat. § 5635 [Rev. 1930], as amended; see also §§ 5636-5638." The statute, Cum. Sup. 1935, § 1659c, was an amendment to Rev. 1930, § 5635. The 1951 Practice Book, chapter 9, § 70, p. 49, wherein the promulgated rules begin, has a similar footnote which reads, in part: "*These rules are made under authority given by Gen. Stat., § 7949; see also §§ 7950-7952." Rev. 1949, § 7949, stated, inter alia: "[T]he judges of the superior court shall make rules to effectuate the foregoing provisions." The "foregoing provisions" list in general terms the items discoverable. The present Practice Book discovery rules begin at chapter 8, § 166, p. 114. The footnote contained in the previous two editions is gone but following § 167, a general discovery rule, are parentheses within which reads "See Gen. Stat., § 52-197 and annotations; 1963." General Statutes § 52-197 reads, inter alia: "The judges of the supreme court shall make rules to effectuate the foregoing provisions." According to the preface to the Practice Book, p. IV, "[t]he origin of each rule appears in parentheses at the end of it."

*In re Appeal of Dattilo,* 136 Conn. 488, 492, 72 A.2d 50, fails to support the proposition that discovery is an exclusive judicial power since the source of the inherent rule-making authority was acknowledged to be the common law; id., 493; whereas discovery was an original and inherent power of a court of equity, unknown to the common law. *Carten* v. *Carten,* 153 Conn. 603, 611, 219 A.2d 711; *Downie* v. *Nettleton,* 61 Conn. 593, 596, 24 A. 977. Consequently, legislation was enacted which did not change the scope of discovery but enabled the courts of law to administer by motion a clearly-defined power of a court of equity. Statutes, 1838, p. 76; Public Acts 1889, c. 22; *Downie* v. *Nettleton,* supra.[3] It has been stated that because discovery was unavailable at common law, the right to discovery is strictly statutory. *Union Trust Co.* v. *Superior Court,* 11 Cal. 2d 449, 459, 81 P.2d 150; *DeCourcy* v. *American Emery Wheel Works,* 89 R.I. 450, 453, 153 A.2d 130; 27 C.J.S., Discovery, § 69. This is not meant to imply that the constitutional courts in Connecticut are powerless to compel the production of documents at trial absent specific statutory authorization, which production is distinguished from pretrial discovery; *Banks* v. *Connecticut Ry. & Lighting Co.,* 79 Conn. 116, 121, 64 A. 14; *Katz* v.

---

[3] It is pointed out in 1 Stephenson, Conn. Civ. Proc. (2d Ed.) § 137, that by the end of the eighteenth century most equitable jurisdiction had been delegated to the courts of law, prior to the 1818 constitution. Until the 1836 legislation (Statutes, 1838, p. 76), however, the independent bill remained necessary to compel the testimony of adverse witnesses because interested parties were not competent to testify. The ability of interested parties to testify on their own behalf and call adverse witnesses was legislatively authorized and understood to change the prior common-law rule. Public Acts 1848, c. 44, 45.

*Richman,* 114 Conn. 165, 171, 158 A. 219;[4] but rather to demonstrate that discovery is not an inherent common-law power of the court and that legislative participation in discovery has been recognized in this state for over 150 years since the constitution of 1818, and such participation has never been challenged as violative of the principle of constitutional separation of powers. "A practical construction placed upon a constitutional provision immediately after its adoption and consistently and repeatedly followed by the legislature for over a century thereafter is most persuasive." *Snyder* v. *Newtown,* 147 Conn. 374, 386, 161 A.2d 770, appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688; *Sanger* v. *Bridgeport,* 124 Conn. 183, 190, 198 A. 746.

Many statutes in Connecticut, other than discovery enactments, affect the inherent discretion of the Superior Court in its control of matters arising during the course of trial. The General Assembly originally changed the prior common-law rule by removing the disability of interested parties to testify and by permitting parties to compel their adversaries to testify. Public Acts 1848, c. 44, 45; *Banks* v. *Connecticut Ry. & Lighting Co.,* supra; *Bissell* v. *Beckwith,* 32 Conn. 509, 516; *Buckingham* v. *Barnum,* 30 Conn. 358, 359; *Eld* v. *Gorham,* 20 Conn. 8, 13. One hundred years later this court continued to recognize the legislature's original

---

[4] The inherent power of the court to compel production of documents at trial was recognized in *Banks* v. *Connecticut Ry. & Lighting Co.,* 79 Conn. 116, 121, 64 A. 14, as arising from the powers of courts to ascertain the truth in connection with the enabling statute and its consequences. The enabling statute referred to is the legislative authorization to a party to compel the testimony of his adversary. This case was relied upon in *Katz* v. *Richman,* 114 Conn. 165, 171, 158 A. 219.

authority in this area, its power to modify its statutes and its ability to change the rules applied by a judge during trial; despite the fact that these enactments may affect the admissibility of evidence or allow cross-examination in legislatively defined instances. Such statutes have been recognized as binding upon the court. General Statutes §§ 52-145, 52-178; *Mendez* v. *Dorman,* 151 Conn. 193, 196–99, 195 A.2d 561; *Martyn* v. *Donlin,* 151 Conn. 402, 406, 198 A.2d 700; *State* v. *Marquez,* 160 Conn. 47, 49–52, 273 A.2d 689; *State* v. *Bitting,* 162 Conn. 1, 9, 10, 291 A.2d 240; *State* v. *Hall,* 165 Conn. 599, 605, 345 A.2d 17. Similar observation may be made concerning legislatively-created exceptions to the hearsay rule.[5] These statutes have not been viewed as unconstitutional invasions of judicial power or

---

[5] The original act concerning entries and memoranda of deceased persons was enacted in 1850; Public Acts 1850, c. 4; and is presently General Statutes § 52-172. The statute has been viewed as remedial, in derogation of the common law and binding upon the courts. The court's duty has been looked upon as how best to effectuate the legislative intent. *Plisko* v. *Morgan,* 148 Conn. 510, 512, 172 A.2d 621; *Graybill* v. *Plant,* 138 Conn. 397, 405, 85 A.2d 238; *Joanis* v. *Engstrom,* 135 Conn. 248, 251, 63 A.2d 151; *Walter* v. *Sperry,* 86 Conn. 474, 477, 85 A. 739; *Mulcahy* v. *Mulcahy,* 84 Conn. 659, 662, 81 A. 242; *Pixley* v. *Eddy,* 56 Conn. 336, 340, 15 A. 758; *Bissell* v. *Beckwith,* 32 Conn. 509, 516; *Douglas* v. *Chapin,* 26 Conn. 76, 91, 92. The modern business entry statute, presently General Statutes § 52-180, was originally enacted as Cum. Sup. 1935, § 1675c. The authority of the General Assembly to enact this legislation has not been questioned. The statute has been interpreted as broadening the prior statutorily authorized shop book rule and creating the mechanism pursuant to which, subject to proper judicial construction, business entries are admissible in court. *Kelly* v. *Sheehan,* 158 Conn. 281, 284, 259 A.2d 605; *Sheary* v. *Hallock's of Middletown, Inc.,* 149 Conn. 188, 195, 177 A.2d 680; *D'Amato* v. *Johnston,* 140 Conn. 54, 56–62, 97 A.2d 893; *Borucki* v. *MacKenzie Bros. Co., Inc.,* 125 Conn. 92, 99–103, 3 A.2d 224; and as establishing a general rule of admissibility applicable both to criminal and civil cases. *State* v. *Hayes,* 127 Conn. 543, 598, 18 A.2d 895.

considered as interfering with judicial functions by unreasonably removing or narrowing the traditional discretion of the trial judge.

This court was confronted with the classic separation of powers problem under article second, the possible imposition of nonjudicial duties upon a Superior Court judge in *Adams* v. *Rubinow,* 157 Conn. 150, 251 A.2d 49. *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 582, 593–96, 37 A. 1080. In this context we upheld the statute which prescribed certain administrative and regulatory duties for a superior court judge as probate court administrator. We construed the duties imposed as judicial and stated that "if the Superior Court finds itself significantly interfered with in the orderly conduct of its judicial functions, it has the inherent power to refuse to acquiesce in this imposition on a judge of its court, and in that event, of course, the attempted delegation would fall as an unconstitutional interference with the proper performance, by the Superior Court, of its judicial functions." *Adams* v. *Rubinow,* supra, 160–61. We cited cases therein which have followed *Norwalk Street Ry. Co.'s Appeal,* and which concluded that the separation of powers issue under article second was the preservation of the judiciary's independence by disallowing legislative interference in areas long understood to be peculiarly judicial.[6] While the language in *Adams* v. *Rubinow* is broad, the holding of that case and its supporting precedent do not

---

[6] *Heiberger* v. *Clark,* 148 Conn. 177, 185, 169 A.2d 652; *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 231–32, 140 A.2d 863; *Bridgeport Public Library & Reading Room* v. *Burroughs Home,* 85 Conn. 309, 319–21, 82 A. 582; *Styles* v. *Tyler,* 64 Conn. 432, 444, 448–49, 30 A. 165.

compel the result that merely because a legislative enactment be deemed procedural, it is not binding on a constitutional court.

It is significant that in many instances this court has acknowledged the validity of procedural legislation. "The legislature unquestionably has the power to enact laws relating to procedure and affecting pending cases." *Lew* v. *Bray,* 81 Conn. 213, 217, 70 A. 628. Against the challenge that a statute which changed the burden of proof in a particular instance amounted to an invasion by the legislature into the field of judicial power and was, therefore, unconstitutional, we noted that "its enactment was fully within the power of the legislative department, notwithstanding its application may, as in this case, vary the ordinary rule of procedure." *Johnson County Savings Bank* v. *Walker,* 79 Conn. 348, 351–52, 65 A. 132; *Norwalk Street Ry. Co.'s Appeal,* supra, 602; *Dawson* v. *Orange,* 78 Conn. 96, 100, 61 A. 101; *Atwood* v. *Buckingham,* 78 Conn. 423, 427–28, 62 A. 616; *State* v. *Torello,* 103 Conn. 511, 519–20, 131 A. 429; *LeBlanc* v. *Grillo,* 129 Conn. 378, 384–85, 28 A.2d 127; *Kelsall* v. *Kelsall,* 139 Conn. 163, 168, 90 A.2d 878; and see cases in preceding paragraphs relating to discovery, admission of evidence and cross-examination. The history of legislative authorization for judicial rule-making, the legislature's authority to make procedural rules and its relation to the court's inherent rule-making ability were discussed in *In re Appeal of Dattilo,* 136 Conn. 488, 492, 494, 72 A.2d 50, in which it was indicated that the statute in question was within both the legislative power and the court's inherent rule-making ability. The court stated (p. 494): "The statute makes admissible in evidence on the hearing of an appeal by the Superior Court the reports of

the investigation it directs to be made; General Statutes § 2815 [Rev. 1949]; and the rule merely amplifies that provision to include reports of investigations made for the use of the Juvenile Court."

The Connecticut Supreme Court has recognized that "[t]he line between the legislative and judicial function is often hard to definitely ascertain"; *Preveslin* v. *Derby & Ansonia Developing Co.,* 112 Conn. 129, 145, 151 A. 518; and has reviewed the practice which our court has pursued in this area, succinctly describing its "long crystalized views of the proper limits of the judicial field in its relation to the other co-ordinate branches of government," as follows: "Our courts have carefully avoided encroachments upon the functions of the legislature, and the rules of practice and procedure under the Practice Act and its amendments have been strictly limited to carrying this legislation into effect, and giving full practical operative force to its provisions. Neither new remedies, nor the extension or curtailment of existing ones have been attempted or suggested by the rules, and this is in manifest harmony with the restrictions which furnish the working method of our practice. . . . If the courts are to exercise broader powers in this respect, the enlargement of their authority should come from legislative sanction rather than from judicial initiative." *Ackerman* v. *Union & New Haven Trust Co.,* 91 Conn. 500, 505, 100 A. 22.

In an article entitled "The Rule-making Powers of the Judges," which served as an introduction to the 1951 Practice Book and is cited in *Adams* v. *Rubinow,* supra, 157, and *Kelsall* v. *Kelsall,* supra, 166, the late Chief Justice Maltbie attempted to reconcile this court's statement in *Ackerman* v. *Union & New Haven Trust Co.* with the court's

inherent rule-making authority. He wrote: "Between these two statements there is no essential conflict. In this state, by immemorial usage, the courts have recognized the right of the general assembly to control the causes of action which can be maintained *and the procedure which is to be followed in them,* although the basis of many recognized actions is to be found solely in the common law. As far as procedure is concerned, the judges have not adopted rules which run counter to laws enacted by the general assembly; but on the other hand, they have not hesitated, and have the inherent right, to promulgate rules *in the absence of controlling legislation.* Nor should it be forgotten that the independence of the three great departments of our government, the executive, the legislative and the judicial, precludes action by any one of them which prevents another from the proper performance of constitutional functions; and should the general assembly ever pass an act *which unreasonably interferes with the administration of justice in the courts,* they would have the constitutional right to disregard it. 'In the establishment of three distinct departments of government the Constitution, by necessary implication, prescribes those limitations and imposes those duties which are essential to the independence of each and to the performance by each of the powers of which it is made the depositary.' *McGovern* v. *Mitchell,* 78 Conn. 536, 547; *State* v. *Stoddard,* 126 Conn. 623, 627."[7] (Emphasis supplied.) Practice Book, 1951, p. XVII.

It is the position of the majority that the fact that the federal Jencks Act, 71 Stat. 595, 18 U.S.C.

[7] For a general discussion of the legislative rule-making power in a separation of powers context, see 16 C.J.S., Constitutional Law, § 128; 16 Am. Jur. 2d, Constitutional Law, § 239, and cases cited.

§ 3500, was promulgated by Congress has no bearing on this case because in the federal system the legislative branch has long been held to have the power to make rules of court. *Sibbach* v. *Wilson & Co.,* 312 U.S. 1, 9, 61 S. Ct. 422, 85 L. Ed. 479; *Wayman* v. *Southard,* 23 U.S. (10 Wheat.) 1, 6 L. Ed. 253. This contention is not persuasive for two reasons: as demonstrated, legislative participation in procedural rule-making in Connecticut has long been recognized and Congress, like the General Assembly, is subject to the dictates of the principle of the constitutional separation of powers. Compare article second and article fifth, § 1 of the Constitution of 1818, as amended, with articles I and III of the United States constitution. The separation of powers principle applies equally to the United States Supreme Court and to any inferior courts ordained and established by Congress.

While much less detailed than its federal counterpart and thereby arguably allowing the trial court greater discretion in its application, § 54-86b is patterned after the federal act. See 13 H.R. Proc., Pt. 13, Spec. Sess. July, 1969, pp. 31–38.[8] We have stated that where a state legislative enactment is patterned after a federal statute, the judicial interpretation of the federal act is of great assistance and persuasive force in the interpretation of the state's statute and that the United States Supreme Court's interpretation of a similarly-worded federal statute is particularly pertinent.[9] *United Aircraft Corporation* v. *International Assn. of Machinists,*

[8] See Goldberg and Cooper, "The Right of An Accused to Examine Statements Under Section 54-86b of the General Statutes: The Scope of Its Application," 45 Conn. B.J., 255, 257.

[9] Compare General Statutes § 54-86b with 18 U.S.C. § 3500, (a), (b) and (d).

161 Conn. 79, 85, 285 A.2d 330; *Windsor* v. *Windsor Police Department Employees Assn., Inc.,* 154 Conn. 530, 536, 227 A.2d 65. The federal statute has not been interpreted by the United States Supreme Court as unconstitutionally circumscribing the discretion of the trial court. Despite its more detailed procedural provisions and similar mandatory language requiring the court to order the prosecution to turn over to the defense related prior statements of prosecution witnesses, the court, speaking through Mr. Justice Frankfurter, stated, "[f]inal decision as to production must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge guided by the standards we have outlined, and subject to the appropriately limited review of appellate courts." *Palermo* v. *United States,* 360 U.S. 343, 353, 79 S. Ct. 1217, 3 L. Ed. 2d 1287. In a footnote, the court discussed federal congressional rule-making power, remarking, "[t]he statute as interpreted does not reach any constitutional barrier." Id., n.11. Concurring in the result, Mr. Justice Brennan, joined by Chief Justice Warren and Justices Black and Douglas, stated: "Congress had no thought to invade the traditional discretion of trial judges in evidentiary matters beyond checking extravagant interpretations of our decision in *Jencks* v. *United States,* 353 U.S. 657 [77 S. Ct. 1007, 1 L. Ed. 2d 1103]." Id., 361.

Although § 54-86b cannot readily be characterized as either procedural or substantive, it is nonetheless true that an enactment in the area of substantive law would be within the legislative domain. *Adams* v. *Rubinow,* 157 Conn. 150, 157, 251 A.2d 49. The legislative history of the statute, entitled "An Act

Concerning the Rights of Accused Persons to Examine Statements," which is patterned after the federal act[10] and the United States Supreme Court's interpretation of the Jencks Act in *Palermo* v. *United States*, supra, demonstrate that the General Assembly intended to confer upon a criminal defendant a right which would enable the defendant to exercise more effectually his constitutionally guaranteed right of confrontation.[11] The act in question, arguably procedural in some contexts, appears distinguishable from a rule which is designed merely to regulate the size of briefs or form of pleadings. Since this statute reasonably can be construed as an attempt by the legislature to confer a substantive statutory right, and the issue herein is the act's constitutionality, "courts should adopt the construction which will uphold the statute even though that construction may not be the most obvious one. *Carilli* v. *Pension Commission*, 154 Conn. 1, 8, 220 A.2d 439; *Ferguson* v. *Stamford*, 60 Conn. 432, 447, 22 A. 782; *Wilton* v. *Weston*, 48 Conn. 325, 338." *Adams* v. *Rubinow*, supra, 153.

In view of the foregoing, there is a reasonable basis upon which the authority of the General Assembly to enact § 54-86b can be sustained. The record reveals that the defendants moved for the statements of the prosecution witnesses in reliance

---

[10] See 13 H.R. Proc., Pt. 13, Spec. Sess. July, 1969, pp. 31–38; Goldberg and Cooper, op. cit., footnote 8, supra.

[11] Mr. Justice Brennan, the author of *Jencks* v. *United States*, 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103, in his concurrence in *Palermo* v. *United States*, 360 U.S. 343, 362–63, 79 S. Ct. 1217, 3 L. Ed. 2d 1287, stated: "It is true that our holding in *Jencks* was not put on constitutional grounds, for it did not have to be; *but it would be idle to say that the commands of the Constitution were not close to the surface of the decision;* indeed, the Congress recognized its constitutional overtones in the debates on the statute." (Emphasis supplied.)

upon the statute. *State* v. *Clemente,* supra. No claim has been made that the statements did not relate to their testimony on the witness stand.[12] The defendants should have had access to the statements of the prosecution witnesses.

BOGDANSKI, J. (dissenting). I concur in the scholarly dissent of my colleague. I would, however, add other compelling reasons for dissenting. General Statutes § 54-86b entitles defendants in criminal prosecutions to examine relevant statements made to the prosecution by the witnesses against them. By enacting § 54-86b, the General Assembly simply granted another right to defendants to enable them more effectively to exercise their constitutional right of confrontation through cross- examination. Conn. Const., art. I § 8. The creation of new rights to ensure a fair trial is an appropriate exercise of legislative power. That § 54-86b may also be a procedural directive to the trial court does not detract from the power of the General Assembly to enact it. For whether viewed historically or analytically, the General Assembly has the constitutional authority to enact rules of practice and procedure.[1]

Article second of the Connecticut constitution distributes the judicial, legislative and executive

---

[12] Were such a claim made by the state, according to the settled practice under the federal act, the trial judge should make a determination concerning the relevance of the statements. *Palermo* v. *United States,* 360 U.S. 343, 354, 79 S. Ct. 1217, 3 L. Ed. 2d 1287; *United States* v. *Covello,* 410 F.2d 536, 546 (2d Cir.); *United States* v. *Sten,* 342 F.2d 491, 493–94 (2d Cir.), cert. denied, 382 U.S. 854, 86 S. Ct. 103, 15 L. Ed. 2d 91.

[1] In their arguments before us the parties have framed the issue in terms of whether § 54-86b is substantive or procedural. In my view that distinction is not germane to the separation of powers question, because rules of procedure affect substantive rights and reflect public policy considerations. See infra. The majority opinion

powers "each . . . to a separate magistracy." As the majority recognize, article second is not a prescription for a rigid functional classification.[2] *In re Application of Clark,* 65 Conn. 17, 38, 31 A. 522. Unlike the constitutions of some other states,[3] our constitution does not explicitly allocate the power to make rules of practice and procedure to a particular branch of government. But article fifth implies that the power resides in the General Assembly. That article, which establishes the Supreme Court and the Superior Court, states that "[t]he powers and jurisdiction of these courts shall be defined by law."[4] Conn. Const., art. V § 1.

affirms the validity of the substance-procedure distinction for separation of powers purposes, but asserts without explanation that § 54-86b cannot be neatly categorized as substantive or procedural. If the majority mean that although § 54-86b governs an aspect of procedure it may vitally affect substantive rights, I wholeheartedly agree. See infra. In that respect it is no different from a great many other procedural enactments. The majority opinion concludes that § 54-86b is unconstitutional because historically the courts have had inherent power to regulate discovery and the discretion to grant or deny the particular kind of criminal discovery controlled by § 54-86b. Those grounds are dealt with in the body of this dissent.

[2] Dean Roscoe Pound admonished that "the regime of separation of powers . . . does not require a rigid analytical classification in which every conceivable activity of government is assigned once for all exclusively to one of the three departments. There are many powers which are of doubtful classification both analytically and historically. . . . [An] example is the making of rules of procedure for the courts which according to whether it is looked at historically or analytically might be regarded as a judicial or as a legislative function. . . . Chief Justice Marshall pointed out the solution long ago. It is a proper legislative function to assign powers of doubtful classification to an appropriate department." Pound, "The Place of the Judiciary in a Democratic Polity," 27 A.B.A.J. 133, 136.

[3] See, for example, the New Jersey constitution, art. VI, § 2, ¶ 3.

[4] The words "these courts" include the Supreme Court and the Superior Court, and the word "law" means statutory law. See *Walkinshaw* v. *O'Brien,* 130 Conn. 122, 134, 32 A.2d 547; see also *Heiberger* v. *Clark,* 148 Conn. 177, 190, 169 A.2d 652.

As Justice Cotter observes in his dissent, " '[a] practical construction placed upon a [doubtful] constitutional provision immediately after its adoption and consistently and repeatedly followed by the legislature for over a century thereafter is most persuasive' " evidence of its meaning. *Snyder* v. *Newtown,* 147 Conn. 374, 386, 161 A.2d 770, appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688; *State* v. *Moynahan,* 165 Conn. 560, 570, 325 A.2d 199 (applying this principle to construe the separation of powers provision). From the first days under our first constitution the General Assembly has been deemed to possess the power to enact rules of procedure for the courts. As Chief Justice Maltbie pointed out, when the General Assembly first constituted the Supreme Court of Errors under the constitution of 1818, it empowered that court by enabling legislation to institute rules of practice. Statutes, 1821, p. 137, § 5. That legislative delegation of rule-making power to the judiciary has continued in effect in various forms to the present day. See General Statutes §§ 51-14,[5] 52-264; *In re Appeal of Dattilo,* 136 Conn. 488, 490–91, 72 A.2d 50; Maltbie, "The Rule-Making Powers of the Judges," Practice Book 1951, p. XI. Moreover, the specific rules of practice and procedure, including discovery rules, which the General Assembly has itself enacted are legion. They form the bulk of

---

[5] General Statutes § 51-14 provides, in pertinent part: "(a) The judges of the supreme court shall adopt and promulgate and may from time to time modify or repeal rules and forms regulating pleading, practice and procedure in judicial proceedings in all courts of the state for the purpose of simplifying the same and of promoting the speedy and efficient determination of litigation upon its merits. Such rules shall not abridge, enlarge or modify any substantive right . . . . (b) *Any rule or any part thereof disapproved by the general assembly by resolution shall be void and of no effect* . . . . " (Emphasis added.)

titles 51, 52, and 54 of the General Statutes.[6] The single most important procedural reform in this state's history, the transition from "common-law" to "code" pleading, was effected by statute. The Practice Act of 1879 abolished the procedural differences between law and equity, instituted the unitary form of civil action and approved the simplified system of fact pleading. Public Acts 1879, c. 83. See *Dunnett* v. *Thornton*, 73 Conn. 1, 6, 46 A. 158; 1 Stephenson, Conn. Civ. Proc. (2d Ed.) § 75 (a); Loomis & Calhoun, The Judicial and Civil History of Connecticut, pp. 89–90.

So numerous are the opinions of this court expressly recognizing the authority of the General Assembly over practice and procedure, including discovery, that they must be relegated to a footnote.[7] The very case which revitalized the doctrine

[6] Specific examples of procedural legislation are contained in the separate dissent of Justice Cotter, and both his opinion and that of the majority refer to the numerous discovery statutes which have been enacted since 1818. See footnote 2 of Justice Cotter's opinion, with accompanying text.

[7] In at least three cases this court firmly rejected arguments that procedural statutes which imposed judicial duties contravened the separation of powers provision of our constitution. *In the Matter of Gilhuly's Petition,* 124 Conn. 271, 280, 199 A. 436 (special statutory proceeding in the nature of mandamus); *Braman* v. *Babcock,* 98 Conn. 549, 551–58, 120 A. 150 (Declaratory Judgment Act); *Johnson County Savings Bank* v. *Walker,* 79 Conn. 348, 351–52, 65 A. 132 (statute shifting burden of proof). See also *Ackerman* v. *Union & New Haven Trust Co.,* 91 Conn. 500, 505, 100 A. 22 (judicial rule-making under the Practice Act), quoted by Justice Cotter in his dissent. Other cases include: *State* v. *Bitting,* 162 Conn. 1, 8–10, 291 A.2d 240 (evidence of prior convictions admissible for impeachment purposes); *Testa* v. *Carrolls Hamburger System, Inc.,* 154 Conn. 294, 295–97, 224 A.2d 739 (statutory expansion of authority to open judgments); *Mendez* v. *Dorman,* 151 Conn. 193, 196–99, 195 A.2d 561 (compelling adverse party to testify; cross-examination); *Black* v. *Universal C.I.T. Credit Corporation,* 150 Conn. 188, 192–94, 187 A.2d 243 (new trial); *Pottetti* v. *Clifford,* 146 Conn. 252, 262, 150 A.2d 207 (discovery); *Kelsall* v. *Kelsall,* 139 Conn. 163, 166–68, 90 A.2d

of separation of powers in this state, *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 37 A. 1080, explicitly acknowledged the validity of procedural legislation: " 'The Superior Court,' in which judicial power is vested by the Constitution, is a magistracy consisting of the judges. The manner in which they shall exercise that power must to a large extent be governed by legislation in respect to procedure."[8]

Historically, the real controversy has centered on the existence of judicial power to adopt rules of practice and procedure without an enabling statute.[9] The inherent power of courts to promulgate such rules without an enabling statute was eventually recognized, for sound practical reasons and because it was necessary if the courts were to function at

---

878 (amendments in divorce actions); *State* v. *English,* 132 Conn. 573, 580, 46 A.2d 121 (removal of common-law disqualification of witness); *Peyton* v. *Werhane,* 126 Conn. 382, 387, 11 A.2d 800 (discovery); *May* v. *Young,* 125 Conn. 1, 9, 2 A.2d 385 (discovery); *Wilcox* v. *Madison,* 106 Conn. 223, 231, 137 A. 742, appeal dismissed, 276 U.S. 606, 48 S. Ct. 337, 72 L. Ed. 728 (statutory tax warrant); *State* v. *Torello,* 103 Conn. 511, 519–20, 131 A. 429 (statutory exceptions to the hearsay rule); *State* v. *Caplan,* 85 Conn. 618, 621–24, 84 A. 280 (appeals to the Supreme Court); *Lew* v. *Bray,* 81 Conn. 213, 217, 70 A. 628 (costs); *Dawson* v. *Orange,* 78 Conn. 96, 100, 61 A. 101 (declaratory judgment statute); *Dunnett* v. *Thornton,* 73 Conn. 1, 6, 46 A. 158 (Practice Act of 1879).

[8] Legislative control over practice and procedure in the courts is not unique to Connecticut. It is the general rule throughout the United States. See *Sibbach* v. *Wilson & Co.,* 312 U.S. 1, 9, 61 S. Ct. 422, 85 L. Ed. 479; *Wayman* v. *Southard,* 23 U.S. (10 Wheat.) 1, 6 L. Ed. 253 (power of Congress to regulate the practice and procedure of federal courts); 1 Sutherland, Statutory Construction (4th Ed.) § 3.27; Levin & Amsterdam, "Legislative Control Over Judicial Rule-Making: A Problem in Constitutional Revision," 107 U. Pa. L. Rev. 1, 3; Pound, "The Rule-Making Power of the Courts."

[9] See Pound, op. cit., footnote 8, supra; 1 Sutherland, op. cit., footnote 8, supra.

all.[10]   Not until 1950 did this court announce the
existence of its inherent rule-making power, in *In
re Appeal of Dattilo,* 136 Conn. 488, 492, 72 A.2d 50.
The statement in that case was dictum, however,
since the court actually grounded its decision on the
broad scope of the enabling statute then in effect.
Nowhere in *Dattilo* was it said, and nothing in that
case implied, that the General Assembly is without
power to enact procedural statutes.   See for con-
firmation, *Stanley* v. *Hartford,* 140 Conn. 643
646–48, 103 A.2d 147.   That the courts have inherent
power to make rules of procedure, including dis-
covery, does not imply that the General Assembly
does not also have that power.

Since 1945 a number of states have adopted new
constitutions which specifically allocated procedural
rule-making power.[11]   Despite that trend, when this
state adopted its new constitution in 1965, no such
allocation was made.   Instead, the drafters kept
article second and article fifth, § 1, substantially as
they were in the constitution of 1818.   It is a fair
presumption that by their nonaction the drafters of
our present constitution approved the enduring
practice of legislative control over procedure.   Cf.
*Hurlbutt* v. *Hatheway,* 139 Conn. 258, 262–63, 93
A.2d 161.

[10] In the absence of governing statutes, the inability of the courts
to adopt their own rules of practice and procedure could stymie
their performance of their adjudicative duties.   Moreover, courts, it
is said, are more able than legislatures to make timely procedural
changes and more aware of the changes which need to be made.
Courts are also said to have greater expertise than legislatures in
matters of procedure and to be less prone to be swayed by extraneous
political considerations.   See Joiner & Miller, "Rules of Practice and
Procedure:   A Study of Judicial Rule Making," 55 Mich. L. Rev.
623, 642–44.

[11] Levin & Amsterdam, "Legislative Control Over Judicial Rule-
Making:   A Problem in Constitutional Revision," 107 U. Pa. L. Rev.
1, 5.

The majority opinion approves the bald assertion in two recent cases that "the General Assembly has no power to make rules of administration, practice or procedure which are binding on either of the two constitutional courts." *Adams* v. *Rubinow,* 157 Conn. 150, 156, 251 A.2d 49; *State ex rel. Kelman* v. *Schaffer,* 161 Conn. 522, 529, 290 A.2d 327. In both opinions that statement was dictum.[12] In neither opinion was it supported by argument or explanation. And in both opinions the cases cited to support the statement do not support it.[13] Approximately 150 years of comprehensive and judicially approved legislative authority over practice and procedure cannot be repudiated by unsupported dicta. Never before the present cases has an act

[12] In *Adams* v. *Rubinow,* 157 Conn. 150, 251 A.2d 49, the question was the constitutionality of the imposition by statute of nonjudicial duties on a Superior Court judge. The statute was upheld. In *State ex rel. Kelman* v. *Schaffer,* 161 Conn. 522, 290 A.2d 327, the appellant took an expedited appeal under both a court rule and a statute which provided an alternative procedure. The court took the appeal under the rule and warned that an appeal taken under the statute alone might not be entertained.

[13] Four cases were cited. *In re Appeal of Dattilo,* 136 Conn. 488, 72 A.2d 50, does not support the assertion of legislative impotence for the reasons stated in the body of this dissent. *Heiberger* v. *Clark,* 148 Conn. 177, 169 A.2d 652, held, and *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 140 A.2d 863, stated in dictum, that the General Assembly has no power to enact a statute fixing qualifications for admission of persons to practice law. The holding of *Heiberger* v. *Clark* was based on the long history of judicial authority over the admission of attorneys and the fact that "attorneys are officers of the court appointed to assist the court in the administration of justice." *Heiberger* v. *Clark,* supra, 186. *Heiberger* v. *Clark* is notable in the present context because the court did not ground its holding of unconstitutionality on the unconstitutionality of statutes governing practice and procedure generally. *Brown* v. *O'Connell,* 36 Conn. 432, the fourth case relied upon, held unconstitutional an act providing for the appointment of a police court judge by a city council, on the ground that only the General Assembly could appoint a judge. The case had nothing to do with rules of practice and procedure.

of the General Assembly governing practice or procedure been held by this court to trespass on the prerogatives of the judiciary in violation of article second of the Connecticut constitution.

The right of the General Assembly to regulate practice and procedure in the courts, including discovery, is confirmed by analysis of the doctrine of separation of powers and the extent of legislative power. For separation of powers purposes, the distinction between "substance" and "procedure" is illusory. The problem is not that the line between the two is imprecise. Rather, questions of "procedure" may and often do present basic issues of public policy above and beyond the subject of efficient judicial administration. "Procedure conditions and determines legal relations. The substantive importance of judicial procedure to society lies in the fact that it conditions and determines the way in which judicial power is made operational. This is a matter of great popular concern." 1 Sutherland, Statutory Construction (4th Ed.) § 3.27. As Mr. Justice Frankfurter succinctly put it, "[t]he history of American freedom is, in no small measure, the history of procedure." *Malinski* v. *New York*, 324 U.S. 401, 414, 65 S. Ct. 781, 89 L. Ed. 1029.

"Under our constitution the General Assembly is vested with full authority to order the affairs of the state except as it is limited by provisions in the constitution of the United States or those of our constitution." *Walkinshaw* v. *O'Brien*, 130 Conn. 122, 133, 32 A.2d 547. "It is the province of the legislative department to define rights and prescribe remedies: of the judicial to construe legislative enactments, determine the rights secured thereby,

and apply the remedies prescribed. . . . 'To declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative.'" *Atwood* v. *Buckingham,* 78 Conn. 423, 428, 62 A. 616. Because its members are popularly elected, the legislature bears primary responsibility for weighing competing public policy considerations. As the branch of government whose members are least subject to control by the electorate, the judiciary is not charged with the formulation of public policy, except as that is a necessary concomitant to adjudication.

It is true that in the area of practice and procedure in the courts, an inherent rule-making power in the judiciary must be acknowledged as a practical necessity. But as the branch of government charged with the determination of public policy, the legislature must have the power to enact binding rules of practice and procedure which do not jeopardize the judicial administration of justice. "A main purpose of the division of powers between legislature and judicature, is to prevent the same magistracy from exercising in respect to the same subject the functions of judge and legislator. This union of functions is a menace to civil liberty, and is forbidden by the Constitution." *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 594, 37 A. 1080. If the power to make and the power to apply rules of procedure and practice are united in the judicial branch, without any check in the form of legislative control, then the safeguard of separation of powers is lost.[14]

---

[14] "[I]t seems doubtful wisdom for a court to place itself beyond legislative control when it pronounces general rules. Even those who think that there is no need to guard against an abuse of power by the court may still sense that, in the very act of abjuring

No procedural statute so well illustrates the propriety of legislative action as does General Statutes § 54-86b itself. That section was enacted to implement the constitutional right of confrontation through cross-examination by entitling defendants in criminal prosecutions to examine relevant statements made to the prosecution by the witnesses against them.[15] Formerly, the rule in this state was that it was "within the discretion of the court to grant or deny a defendant the right to inspect statements of the state's witnesses in the possession of the state's attorney." *State* v. *Pikul,* 150 Conn. 195, 202, 187 A.2d 442. That rule was based on a view of public policy first expressed in 1787 in *State* v. *Phelps,* Kirby 282, and subsequently reaffirmed in *State* v. *Zimnaruk,* 128 Conn. 124, 127, 20 A.2d 613: "Disclosures, under such circum-

immunity from correction when it lays down a general rule, the court strengthens its moral force as an instrument of adjudication." Kaplan & Greene, "The Legislature's Relation to Judicial Rule-Making: An Appraisal of *Winberry* v. *Salisbury,*" 65 Harv. L. Rev. 234, 254. Accord, Maltbie, "The Rule-Making Powers of the Judges," Practice Book 1951, pp. XI, XVI–XVIII; Levin & Amsterdam, "Legislative Control Over Judicial Rule-Making: A Problem in Constitutional Revision," 107 U. Pa. L. Rev. 1, 18–20; 1 Sutherland, Statutory Construction (4th Ed.) § 3.27; Pound, "The Place of the Judiciary in a Democratic Polity," 27 A.B.A.J. 133, 136.

[15] General Statutes § 54-86b is the statutory enactment of the rule of *Jencks* v. *United States,* 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103, in which the United States Supreme Court held that in federal prosecutions defendants were entitled to statements made by prosecution witnesses and in the possession of the prosecution. The right was subsequently restricted by Congress in legislation known as the Jencks Act, 71 Stat. 595, 18 U.S.C. § 3500. The constitutionality of the Jencks Act was confirmed in *Palermo* v. *United States,* 360 U.S. 343, 79 S. Ct. 1217, 3 L. Ed. 2d 1287. In *State* v. *Pikul,* 150 Conn. 195, 187 A.2d 442, this court refused to adopt the *Jencks* rule. The General Assembly did adopt it in 1969. General Statutes § 54-86b; Public Acts 1969, No. 680. Thereafter, the requirements of § 54-86b were added to the Practice Book. Practice Book §§ 533M–533S.

stances, to the attorney, ought to be considered as confidential, and it would tend to defeat the benefits the public may derive from them, should they be made use of to the prejudice of those from whom they come." But the decision to grant or deny a right of discovery of statements of prosecution witnesses also involves other policy considerations. It has been feared that such discovery would enable defendants "to prepare their own perjury, to suborn the perjury of others, or otherwise to fabricate evidence in order to shape a defense to the contours of the prosecution's disclosed evidence." But it has been urged in favor of such discovery that "the integrity of the fact-finding process in the criminal trial" is at stake, as well as the effectiveness of the defendant's constitutional right of confrontation. Nakell, "Criminal Discovery for the Defense and the Prosecution—The Developing Constitutional Considerations," 50 N.C.L. Rev. 437, 437–38, 442–43; note, "The Jencks Right: Judicial and Legislative Modifications, The States and the Future," 50 Va. L. Rev. 535, 552–53. The choice between those competing policy considerations is a legislative prerogative. Indeed, when the United States Supreme Court presumed to make the choice for the federal system in *Jencks* v. *United States,* 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103, many expressions of public and Congressional outrage resulted. See comment, "The Jencks Legislation: Problems in Prospect," 67 Yale L.J., 674, 680–82. Under our system of government, a decision of such importance is one for the people's elected representatives to make. *Walkinshaw* v. *O'Brien,* supra; *Atwood* v. *Buckingham,* supra.

The constitutional provision for separation of powers does indeed impose a limitation on the power

of the General Assembly to enact rules of practice and procedure for the courts. A procedural statute is invalid if it is so burdensome or unreasonable as to interfere with the administration of justice or the functioning of the courts.[16] *Adams* v. *Rubinow,* supra, 158; Maltbie, "The Rule-Making Powers of the Judges," Practice Book 1951, pp. XI, XVII; 1 Sutherland, Statutory Construction (4th Ed.) § 3.27; Levin & Amsterdam, "Legislative Control Over Judicial Rule-Making: A Problem in Constitutional Revision," 107 U. Pa. L. Rev. 1, 30–32.

General Statutes § 54-86b does not fail that test. It does not impose a nonjudicial duty on the court. Cf. *Adams* v. *Rubinow,* supra; *Norwalk Street Ry. Co.'s Appeal,* supra. Nor does it deprive the trial court of that discretion to control criminal discovery which it must have if it is to fulfill its judicial functions. Indeed, in view of the incorporation of § 54-86b in our Practice Book in 1972, with elaboration, it would seem impossible to make that argument. See Practice Book §§ 533M–533S. If the state's attorney denies that a statement in his possession "relates to the subject matter as to which the witness has testified" (in the words of the statute), nothing in § 54-86b prevents the court from itself examining the statement to rule on the motion to produce.

The defendants in these cases were convicted of serious crimes. But their convictions are tainted by the denial of rights which the General Assembly granted defendants to ensure fairness in criminal prosecutions. In my view, the majority upholds their convictions by misinterpreting a fundamental constitutional principle. I must respectfully dissent.

---

[16] The majority opinion concedes that that is the test of constitutionality, but does not proceed to apply it.