******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PERSELS AND ASSOCIATES, LLC *v.* BANKING
COMMISSIONER
(SC 19359)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa, Robinson and
Vertefeuille, Js.

Argued April 23—officially released September 15, 2015

*Robert M. Frost, Jr.,* for the appellant (plaintiff).

*Patrick T. Ring,* assistant attorney general, with whom were *Matthew J. Budzik,* assistant attorney general, and, on the brief, *George Jepsen,* attorney general, for the appellee (defendant).

*Opinion*

VERTEFEUILLE, J. Connecticut's debt negotiation statutes, General Statutes §§ 36a-671 through 36a-671e,[1] authorize the defendant, the Banking Commissioner (commissioner), to license and regulate persons engaged in the debt negotiation business. Attorneys who provide debt negotiation services are not exempted generally from such regulation, except those attorneys "admitted to the practice of law in [Connecticut] who [engage] or [offer] to engage in debt negotiation as an ancillary matter to such [attorneys'] representation of a client . . . ." General Statutes § 36a-671c (1) (attorney exception). The dispositive question presented by this appeal[2] is whether the debt negotiation statutes unduly permit the commissioner to interfere with the Judicial Branch's regulation of the practice of law and, therefore, violate the separation of powers provision contained in article second of the constitution of Connecticut.[3] We conclude that § 36a-671c offends the state constitution. We therefore reverse the judgment of the trial court, which rejected the plaintiff's constitutional challenge and dismissed its administrative appeal.

The present appeal arises from a petition for a declaratory ruling that the plaintiff, Persels & Associates, LLC, a national consumer advocacy law firm, filed with the commissioner in 2012, seeking a determination that the plaintiff is exempt from the debt negotiation statutes. Before reviewing the procedural history of the case, it will be instructive to consider briefly the relevant statutory scheme, its history, and the mischief to which it is directed.

Section 36a-671 (a) (1) defines debt negotiation as "for or with the expectation of a fee, commission or other valuable consideration, assisting a debtor in negotiating or attempting to negotiate on behalf of a debtor the terms of a debtor's obligations with one or more mortgagees or creditors of the debtor, including the negotiation of short sales of residential property or foreclosure rescue services . . . ." In his declaratory ruling on the plaintiff's petition, the commissioner described the origins of Connecticut's debt negotiation statutes: "Since the economic downturn in 2007, the [Department of Banking (department)] has seen a rising number of complaints against debt negotiation firms. . . . Connecticut residents and consumers struggling financially are turning to debt negotiators as an alternative to bankruptcy and as a potential solution to their increasing consumer debt levels. . . . [M]any debt negotiators mislead debtors, collecting thousands of dollars in [up-front] fees without performing any debt negotiation work and often making a debtor's circumstances worse. . . . [T]he most common business model in the industry . . . requires consumers to stop paying their debts, during which time the debtor falls

[further] behind in his or her bills, the debt itself increases through interest and collection fees, lawsuits may be brought against the debtor, and the debtor's already weak credit rating will be damaged even further. . . . Unfortunately, enrolling in a debt negotiation program worsens the family's financial situation in the overwhelming majority of cases . . . . [C]ompanies like [the plaintiff] . . . lure in new customers, take hard-working consumers' limited funds, and ultimately provide little or no value for that money. . . .

"Because of these serious problems, [the commissioner] sought statutory authority to regulate the debt negotiation industry in 2009. . . . [Number 9-208, §§ 29 through 32, of the 2009 Public Acts, which was codified as § 36a-671 et seq., was intended to] update and increase the power of the [c]ommissioner to try to protect people who find themselves in difficult times and dealing with these kinds of organizations." (Citations omitted; internal quotation marks omitted.)

There are four principal components to the regulatory scheme that the legislature enacted in 2009 to address these concerns. First, any person wanting to offer or provide debt negotiation services in Connecticut must first obtain a license from the department. See General Statutes § 36a-671 (b). Before issuing such a license, the commissioner must approve the "financial responsibility, character, reputation, integrity and general fitness" of the applicant; General Statutes § 36a-671 (d) (1); and the applicant must pay a fee of $1600; General Statutes § 36a-671 (e); and obtain a surety bond. General Statutes § 36a-671d. Second, General Statutes § 36a-671a (b) authorizes the commissioner to conduct an investigation into any debt negotiation transaction, and to discipline anyone he finds to have violated the debt negotiation laws, committed fraud, misappropriated funds, or failed to perform any debt negotiation agreement with a debtor. Specifically, the commissioner may suspend, revoke, or refuse to renew a debt negotiation license; General Statutes § 36a-671a (a); order financial restitution and disgorgement of fees; General Statutes § 36a-50 (c); and assess a civil penalty of up to $100,000 per violation. General Statutes § 36a-50 (b). Third, the debt negotiation statutes prohibit the charging of up-front fees for such services, and authorize the commissioner to establish a schedule of maximum fees.[4] General Statutes § 36a-671b (b). The commissioner also may review the fees charged by a person offering debt negotiation services and order the reduction of excessive fees. General Statutes § 36a-671a (c). Fourth, the statutes establish various contractual protections that must be afforded to a debt negotiation consumer; General Statutes § 36a-671b (a); and provide that any contract that fails to provide such protections is voidable by the consumer. See General Statutes § 36a-671b (c). For example, each debt negotiation customer must be provided a contract that contains: "(1) a state-

ment certifying that the person offering debt negotiation services has reviewed the consumer's debt . . . (2) an individualized evaluation of the likelihood that the proposed debt negotiation services would reduce the consumer's debt or debt service or, if appropriate, prevent the consumer's residential home from being foreclosed [and (3) a prominent notice that] the consumer [may] cancel or rescind such contract within three business days after the date on which the consumer signed the contract." General Statutes § 36a-671b (a).

Other states enacted similar protections in the wake of the residential mortgage crisis of the last decade,[5] and the Federal Trade Commission passed amendments to its Telemarketing Sales Rule to curb deceptive and abusive debt negotiation practices. Among other things, the new Federal Trade Commission regulations "set forth disclosure requirements for the industry, prohibited certain misrepresentations in the telemarketing of debt relief services, and banned debt relief service companies . . . from charging fees to consumers in advance of renegotiating, settling or reducing unsecured debt balances. 16 C.F.R. [§ 310.1 et seq.], 75 Fed. Reg. [48458] 48460 ([August] 10, 2010) . . . ." (Citation omitted.)

Connecticut's debt negotiation statutes contain a provision that exempts certain persons from the scope of these regulations and licensing requirements. See General Statutes § 36a-671c. As initially enacted, § 36a-671c provided in relevant part: "The provisions of sections [36a-671 to 36a-671d], inclusive . . . shall not apply to the following: (1) Any attorney admitted to the practice of law in this state, when engaged in such practice . . . ." Public Acts 2009, No. 09-208, § 31; see General Statutes (Rev. to 2011) § 36a-671c. This attorney exception presumably reflected the legislature's recognition that, under article second of the state constitution, the Judicial Branch has the exclusive authority to license and regulate the practice of law in this state. See *Lublin* v. *Brown*, 168 Conn. 212, 228, 362 A.2d 769 (1975).

In 2011, however, the legislature amended § 36a-671c so that the attorney exemption now extends only to an "attorney admitted to the practice of law in this state who engages or offers to engage in debt negotiation *as an ancillary matter to such attorney's representation of a client* . . . ." (Emphasis added.) Public Acts 2011, No. 11-216, § 43. The legislative history is silent as to the rationale for this amendment. The commissioner, however, indicates that the department itself lobbied the legislature for the amendment, with the purpose of clarifying and narrowing the scope of the attorney exemption "[t]o combat abuse of the statutory exemption . . . ."

In his declaratory ruling, the commissioner described these alleged abuses as follows: "The increase in state

[and federal] regulation . . . caused a paradigm shift in the industry whereby debt relief companies changed their business models in an attempt to avoid the [new Federal Trade Commission rules] and state regulation. . . . One of these models is the so-called 'attorney model,' whereby a debt relief company affiliates itself with local attorneys who purport to do 'legal services' on behalf of clients. . . . The attorney model has not alleviated the problems in the debt negotiation industry, but at times has created another avenue to mislead consumers. Consumers are told that an attorney will represent them in negotiations with creditors and provide legal assistance when, in fact, the attorney's involvement is minimal or nonexistent. . . . In many cases, newly admitted attorneys are employed by national debt negotiation firms and consumers are charged excessive [up-front] fees for legal services that consist only of debt negotiation services." (Citations omitted.) The commissioner's findings in this respect echo those of a report recently published by the New York City bar, which report is part of the administrative record in this case. See Association of the Bar of the City of New York, "Profiteering from Financial Distress: An Examination of the Debt Settlement Industry" (May 2012) pp. 77–94 (New York City Bar Report). In any event, it is this amended attorney exemption that is the subject of the present appeal.

In 2012, pursuant to General Statutes § 4-176, the plaintiff petitioned the commissioner for a declaratory ruling stating that, pursuant to the attorney exception, "a law firm that offers debt negotiation services to its clients using Connecticut attorneys is not required to have a debt negotiation license from the department, when the debt negotiation services are delivered in aid of an attorney's representation of a client, as evidenced by a retainer agreement, the offering of legal advice, and the delivery of other services constituting the practice of law." In support of its petition, the plaintiff alleged the following facts. "[The plaintiff] is a Maryland-based, national consumer advocate law firm that offers legal services to its clients in connection with compromises of unsecured debt, defense of creditor collection [lawsuits], protection from creditor harassment, and bankruptcy. The firm uses Connecticut lawyers working in tandem with paraprofessional staff to provide these services. The Connecticut lawyers are actively involved in representing the clients and are responsible for the actions of the paraprofessional staff under the Rules of Professional Conduct applicable to lawyers. Although the Connecticut attorneys that provide services on behalf of [the plaintiff] are licensed by the Judicial Branch and regulated by the Statewide Grievance Committee and the Office of Chief Disciplinary Counsel, [the plaintiff] and its Connecticut attorneys do not have a separate license from the [department] to provide debt negotiation services.

"In its retainer agreements with clients, [the plaintiff] agrees to provide, inter alia, debt negotiation services, but it also agrees to provide other legal services clearly constituting the practice of law. As part of the representation, the [plaintiff] assigns a Connecticut attorney to consult with each client about their legal options. This includes legal advice on topics such as the applicable statute of limitations, the advantages and disadvantages of bankruptcy, garnishment exemptions, and litigation options and strategies. If litigation develops, the assigned Connecticut attorney assists the client in preparing answers to complaints and arbitration demands, drafts responses to discovery (if applicable), drafts cease and desist letters to creditors, and, when appropriate, helps the client assert claims against creditors who violate the law on collection practices. For an additional fee, the [plaintiff] also offers to provide bankruptcy consultations to those clients who cannot settle their debts outside of bankruptcy. Thus, while it is true that [the plaintiff] specializes in debt-relief matters and most of its clients receive debt-relief services, [the plaintiff] does so in the context of providing legal advice and legal work that goes beyond mere debt negotiation and settlement. . . .

"[The plaintiff] keeps records detailing each attorney's and paralegal's work on behalf of each of its clients. Each attorney is required to make an electronic record of the advice given. A database is used to keep detailed records of every interaction between the clients and the [the plaintiff's] attorney, and [the plaintiff] has agreed to make these records available to the Office of Chief Disciplinary Counsel in the event a grievance is filed by a client to confirm that a Connecticut attorney was actively involved and supervised the paraprofessional staff during the representation."

The plaintiff also submitted with its petition an October, 2011 settlement agreement between the plaintiff and the Office of Chief Disciplinary Counsel, which agreement disposed of grievances that had been brought against three of the plaintiff's attorneys. Under the settlement, the plaintiff agreed, among other things, that: (1) "For each Connecticut client that hires [the plaintiff] to perform, inter alia, debt settlement services, [the plaintiff] will have procedures and policies in place to ensure that an initial consultation occurs between the Connecticut client and a [plaintiff's] attorney admitted to practice law in Connecticut"; (2) "[the plaintiff] will have procedures and policies in place to ensure that the initial consultation fee is not collected until such time as the initial consultation has occurred and the fee is earned"; and (3) "[the plaintiff] will have [policies], training, and procedures in place to ensure that there is adequate supervision of paralegals and other [nonlawyer] assistants . . . ." The Office of Chief Disciplinary Counsel also recognized that "the nature

of [the plaintiff's] practice and the manner in which legal services are rendered through Connecticut attorneys is relatively new . . . ."

Before ruling on the plaintiff's petition, the commissioner invited public comment thereon. Thirteen comment letters were filed in response. One letter, submitted by the Deputy Chief Court Administrator for the Connecticut Judicial Branch, indicated that "[t]he Judicial Branch shares the [department's] concerns regarding the infiltration of debt negotiation firms into our state and the goal of protecting our citizens from unscrupulous tactics used and ineffective services rendered by these unlicensed entities." The Deputy Chief Court Administrator also expressed the concern, however, that the department not unduly encroach on the Judicial Branch's authority to regulate attorney conduct. A second comment letter, submitted on behalf of other national law firms offering debt negotiation services, broadly supported the plaintiff's petition.

The other eleven comment letters opposed the petition and alleged that the plaintiff had omitted material facts about its business operations. These comments were submitted by members of the Connecticut bar, including various consumer protection, bankruptcy, and debt collection/settlement attorneys; a former Chief Disciplinary Counsel of the State of Connecticut; and six government agencies and nonprofit organizations that serve the interests of low income and other vulnerable consumers. For the most part, these letters echoed four themes.

First, members of the Connecticut bar and consumer advocate organizations alleged that the plaintiff and other national debt negotiation companies prey on uninformed consumers whose financial problems leave them desperate for assistance and vulnerable to false or misleading marketing claims. The comments alluded to "numerous reports and consumer complaints that unscrupulous entities holding themselves out as debt negotiation firms frequently take advantage of consumers by charging large, [up-front] fees while providing little or no relief . . . ."

The second theme that repeatedly emerged from the public comment letters was that, in its petition, the plaintiff materially misrepresented the nature of its business model. Specifically, commenters alleged that the plaintiff and its affiliates do not in fact engage in the practice of law, they are simply debt negotiation companies masquerading as law firms, and they use attorneys as a facade to circumvent state regulations such as § 36a-671 et seq. The substance of the charge is that although Connecticut attorneys ostensibly oversee the plaintiff's debt negotiation services, in fact these attorneys do little actual work and the arrangement is devoid of any of the indicia of the bona fide practice of law. The public comment letters further contend that,

because most established attorneys refuse to lend their support to such a scheme, debt negotiation companies such as the plaintiff are forced to target newly minted attorneys, whom they can more easily exploit.

As a result of these practices, the commenters contend, financially troubled Connecticut consumers have suffered a range of harms. They are deprived of their limited funds, and are subjected to lawsuits, bank executions, and wage garnishments. In addition, because they are falsely assured that the debt negotiation companies and their attorneys will handle any litigation and settle outstanding debts prior to judgment, consumers are deterred from seeking out bona fide legal assistance.

A third theme frequently echoed by the public comment letters was that these various complaints and allegations have been the subject of numerous legal and administrative actions against the plaintiff in other jurisdictions. The commenters referred the commissioner to individual lawsuits, consumer class actions, attorney grievances, and administrative actions that have been brought against the plaintiff, its officers, or affiliated entities in Florida, Kansas, Maryland, Missouri, North Carolina, and Washington, as well as Connecticut. In particular, they emphasized one decision of the United States Bankruptcy Court for the District of Kansas, which concluded that "[the plaintiff] and [its local Kansas counsel] may hold themselves out as lawyers providing unbundled, limited legal representation, but there is plenty of evidence . . . that they walk, swim, and quack like a credit services organization that supplies debt settlement services while posing as a law firm." (Internal quotation marks omitted.) *In re Kinderknecht*, 470 B.R. 149, 185 (Bankr. D. Kan. 2012), objections overruled sub nom. *Parks* v. *Persels & Associates, LLC*, 509 B.R. 345 (Bankr. D. Kan. 2014). Commenters also submitted the results of a Freedom of Information Act request to the Federal Trade Commission that disclosed seventy-four administrative complaints against the plaintiff and approximately 200 complaints against its various affiliates. The commenters contend that these cases cast serious doubt on the plaintiff's claim that its local attorneys are actively involved in each debt negotiation representation.

The fourth concern raised by many of the public comment letters submitted to the commissioner is that if the tail is truly wagging the dog here, and nonlawyer debt negotiation entities or personnel are both directing the plaintiff's debt negotiation business and performing the majority of the allegedly legal work, then affording firms such as the plaintiff immunity under § 36a-671c will create a regulatory void. Such firms will be exempt from regulation by the department, because they purport to provide legal services under the supervision of Connecticut attorneys. Because they themselves are not Connecticut attorneys, however, they also fall beyond

the reach of the Statewide Grievance Committee and the Office of Chief Disciplinary Counsel. Although the local Connecticut attorneys who do such firms' bidding will, of course, be subject to discipline, if those attorneys are merely pawns of the debt negotiation companies, and are not the ones who are managing and profiting from those businesses, then disciplining them will do little either to deter abuses or to protect and recompense vulnerable consumers.

Lastly, one commenter submitted to the commissioner the previously referenced New York City Bar Report, which reiterates and documents many of these allegations. That report concludes, among other things, that: (1) "thousands of New Yorkers have . . . experienced net financial loss and lasting financial harm due to their involvement with debt settlement service providers"; New York City Bar Report, supra, p. 1; (2) "enforcement agencies have filed dozens of enforcement actions against unscrupulous operators"; id.; (3) "[a]n extensive public record details widespread and systematic deceptive and abusive practices"; id.; and (4) providers' use of the " 'purported attorney model' " to take advantage of loopholes in consumer protection regulations is "especially troubling." Id., p. 2.

Turning to the statutory language, the commissioner determined, as a matter of law, that the attorney exemption contained in § 36a-671c "provides an exemption . . . only for a natural person who: (a) is an attorney admitted to the practice of law in Connecticut; and (b) is not retained to perform, and does not perform, debt negotiation services . . . as the *primary purpose* of the representation, which shall be determined on a case-by-case basis in light of all of the facts and circumstances.

"In addition, [the] [d]epartment will take a no-action position for a law firm that is a partnership, limited liability company or professional corporation engaging or offering to engage in debt negotiation services . . . to be performed and performed exclusively by an attorney admitted to the practice of law in Connecticut who is: (a) a partner or shareholder of the law firm, as the case may be; and (b) the only contact with the debtor and the debtor's mortgagee(s) or creditor(s), as the case may be; and provided that the firm is not retained to perform, and does not perform, debt negotiation services as the primary purpose of the representation, which shall be determined on a case-by-case basis in light of all of the facts and circumstances." (Emphasis added.)

On the basis of the facts alleged in the petition, the commissioner concluded that the plaintiff does not qualify for exemption from the debt negotiation statutes under the attorney exception, because the plaintiff is not a natural person and it performs debt negotiation services, including communications with clients and

creditors, through paraprofessional employees who are not attorneys admitted to the practice of law in Connecticut and who are neither shareholders nor partners of the firm. Accordingly, the commissioner ruled that, under its alleged business model, the plaintiff would require licensure in order to offer its debt negotiation services to Connecticut consumers, and its provision of those services would be subject to oversight by the department.[6]

The plaintiff appealed from the commissioner's ruling to the Superior Court, challenging the commissioner's interpretation and application of § 36a-671c. The court, *Prescott, J.*, affirmed the commissioner's declaratory ruling, concluding, as a matter of law, that: (1) the attorney exception applies only to natural persons; (2) it was not improper for the commissioner, in construing § 36a-671c, to adopt a "primary purpose" test pursuant to which the department will take enforcement action for unlicensed debt negotiation activity against an otherwise qualifying attorney or law firm where debt negotiation is, or reasonably could be understood by the debtor to be, the primary purpose of the relationship or the actual services performed; (3) the commissioner did not abuse his discretion in adopting a no action position that exempted only those law firms that provide debt negotiation services solely via partners or shareholders; (4) the plaintiff lacked standing to challenge this no action policy; and (5) because debt negotiation does not constitute the practice of law, § 36a-671c does not unconstitutionally delegate to the department the authority to license and regulate the practice of law.

On appeal to this court, the plaintiff challenges each of these conclusions. Because we agree with the plaintiff as to its fifth challenge, and conclude that the attorney exemption violates the constitutional separation of powers, we need not address the plaintiff's other claims.[7]

The following principles govern the disposition of the plaintiff's constitutional challenge. In reviewing a trial court's dismissal of an appeal from an administrative declaratory ruling, we must take the facts to be those alleged in the complaint, construing them in the manner most favorable to the pleader. See *Pamela B.* v. *Ment*, 244 Conn. 296, 308, 709 A.2d 1089 (1998). Our review of a claim that a legislative delegation of authority violates the constitutional separation of powers is plenary. See *Perry* v. *Perry*, 222 Conn. 799, 802, 611 A.2d 400 (1992), overruled on other grounds by *Bryant* v. *Bryant*, 228 Conn. 630, 636 n.4, 637 A.2d 1111 (1994), and *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 658–59, 646 A.2d 133 (1994).

With respect to the plaintiff's constitutional claim, we have explained that "[t]he primary purpose of [the separation of powers] doctrine is to prevent commingling of different powers of government in the same

hands. . . . The constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers. . . . It is axiomatic that no branch of government organized under a constitution may exercise any power that is not explicitly bestowed by that constitution or that is not essential to the exercise thereof. . . . [Thus] [t]he separation of powers doctrine serves a dual function: it limits the exercise of power within each branch, yet ensures the independent exercise of that power. . . .

"In the context of challenges to statutes whose constitutional infirmity is claimed to flow from impermissible intrusion upon the judicial power, we have refused to find constitutional impropriety in a statute simply because it affects the judicial function . . . . A statute violates the constitutional mandate for a separate judicial magistracy only if it [1] represents an effort by the legislature to exercise a power which lies exclusively under the control of the courts . . . or [2] if it establishes a significant interference with the orderly conduct of the Superior Court's judicial functions." (Citation omitted; internal quotation marks omitted.) *State* v. *McCahill*, 261 Conn. 492, 505, 811 A.2d 667 (2002). In the present case, the plaintiff alleges that the debt negotiation statutes violate the first prong of this test.

We have held unconstitutional under this test statutes that: interfered with the authority of the Superior Court to set postconviction bail; see id., 520–20A, 520F; infringed on the Superior Court's control over the discovery process; see *State* v. *Clemente*, 166 Conn. 501, 516, 353 A.2d 723 (1974); imposed nonjudicial duties on a judge of the Superior Court; see *Adams* v. *Rubinow*, 157 Conn. 150, 175, 251 A.2d 49 (1968); and intruded on the power of the judiciary to fix the qualifications for admission to the practice of law. See *Heiberger* v. *Clark*, 148 Conn. 177, 191, 169 A.2d 652 (1961); see also *State ex rel. Kelman* v. *Schaffer*, 161 Conn. 522, 529, 290 A.2d 327 (1971) (noting that "General Assembly lacks any power to make rules of administration, practice or procedure which are binding on . . . constitutional courts"), overruled on other grounds by *Serrani* v. *Board of Ethics*, 225 Conn. 305, 309 n.5, 622 A.2d 1009 (1993); *Macy* v. *Cunningham*, 140 Conn. 124, 132, 98 A.2d 800 (1953) (noting that supervision of trusts, including appointment of successor trustees, is purely judicial function, statutory abridgement of which would be unconstitutional). We emphasize that "[i]t has been the policy of our courts more often than not to defer to the legislature, especially in that indefinable area of power that exists between these two departments of government. In those instances, however, where there was a clear invasion of judicial power by the legislature, these cases illustrate that the courts have not hesitated to step in. This was not done as a

manifestation of the court's own power but as a duty imposed by the constitution to keep the three great departments of the government separate. Otherwise, acquiescence to a gradual invasion of the judiciary by the legislature would eventually render the former little more than a judicial staff of the legislature. All pretense of independence would disappear and the judicial power would come to rest again in the hands of the General Assembly as it did prior to the year 1818." *State* v. *Clemente*, supra, 515.

In the present case, the plaintiff contends that, under the facts as alleged, the debt negotiation statutes impermissibly intrude on the judiciary's exclusive authority to regulate attorney conduct and licensure. For example, the plaintiff argues that subjecting Connecticut licensed debt negotiation attorneys, and those persons whom they supervise pursuant to rules 5.3 and 5.5 of the Rules of Professional Conduct, to the licensing and regulatory requirements imposed by the debt negotiation statutes would, among other things, improperly: (1) give the commissioner the authority to determine which attorneys in this state have the "character, reputation, integrity and general fitness" to provide debt negotiation services in conjunction with their practice of law; General Statutes § 36a-671 (d) (1); (2) require that Connecticut attorneys obtain additional licenses from and pay hefty licensing fees to agencies outside the Judicial Branch in order to offer traditional legal services; and (3) impinge on the Judicial Branch's exclusive authority to suspend or disbar attorneys who have engaged in professional misconduct. We agree.

"The judicial power includes such power as the courts, under the English and American systems of jurisprudence, have always exercised in legal and equitable actions." (Internal quotation marks omitted.) *State* v. *Clemente*, supra, 166 Conn. 509. This power includes the exclusive authority to "[fix] qualifications for, as well as [admit] persons to, the practice of law in the state . . . ." (Citations omitted.) Id., 514–15; accord *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 231, 140 A.2d 863 (1958). The control of the judiciary over standards for admission to the bar is a matter of long tradition; it reflects and is justified by the unique status of attorneys as commissioners of the Superior Court and the special role they play in the administration of justice. See generally *In re Application of Griffiths*, 162 Conn. 249, 294 A.2d 281 (1972), rev'd on other grounds, 413 U.S. 717, 93 S. Ct. 2851, 37 L. Ed. 2d 910 (1973); *Heiberger* v. *Clark*, supra, 148 Conn. 186–89; see also *O'Brien's Petition*, 79 Conn. 46, 49–50, 63 A. 777 (1906) (exclusive power of admitting attorneys has resided with Connecticut judiciary since early eighteenth century), overruled on other grounds by *In re Application of Dinan*, 157 Conn. 67, 72, 244 A.2d 609 (1968). For these reasons, we have made clear that "[n]o statute can control the judicial department

in the performance of its duty to decide who shall enjoy the privilege of practicing law"; (internal quotation marks omitted) *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 232; and that "[a]ny attempt on the part of the legislative department to direct what the rules [for attorney admission] shall be, and to determine what qualifications applicants for admission shall possess, transgresses the constitutional power of that department." *Heiberger* v. *Clark*, supra, 191.

It also is well established that the "authority to discipline and regulate the conduct of counsel"; *Bartholomew* v. *Schweizer*, 217 Conn. 671, 677, 587 A.2d 1014 (1991); is a "fundamental judicial power . . . ." Id., 681. Although we have recognized that the legislature exercises concurrent jurisdiction over certain aspects of attorney conduct; see *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 461 A.2d 938 (1983) (attorneys not exempt from Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.); we since have clarified that the authority of the legislature to regulate attorney conduct is limited to "the entrepreneurial or commercial aspects of the profession of law." *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 35, 699 A.2d 964 (1997). Regulation of the actual practice of law, by contrast, remains the sole province of the judiciary. See *Lublin* v. *Brown*, supra, 168 Conn. 228 ("[attorneys'] admission to practice and their professional conduct after admission are essentially matters to be regulated by the judicial department of the state" [internal quotation marks omitted]); but see *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 568, 663 A.2d 317 (1995) (judiciary has inherent power to regulate attorney conduct but such power overlaps that of executive branch with respect to discipline of prosecutors); *Lublin* v. *Brown*, supra, 228 (recognizing that "inherent power of the judicial department to control admission to the bar, to discipline its members, and to prescribe rules for their conduct as officers of the court does not confer upon those members immunity or exemption from tax assessments or civil and criminal statutes of general application").

It is clear, then, that the judiciary wields the sole authority to license and regulate the general practice of law in Connecticut. It is equally clear, however, that the judiciary does not exercise exclusive control over attorney conduct insofar as an attorney is not engaged in the practice of law. Accordingly, the central question presented by this appeal is whether an attorney who provides debt negotiation services *as characterized by the plaintiff* in this declaratory action is thereby engaged in the practice of law.

Practice Book § 2-44A defines the practice of law broadly. That section provides in relevant part: "(a) General Definition: The practice of law is ministering

to the legal needs of another person and applying legal principles and judgment to the circumstances or objectives of that person. This includes, but is not limited to:

"(1) Holding oneself out in any manner as an attorney, lawyer, counselor, advisor or in any other capacity which directly or indirectly represents that such person is either (a) qualified or capable of performing or (b) is engaged in the business or activity of performing any act constituting the practice of law as herein defined.

"(2) Giving advice or counsel to persons concerning or with respect to their legal rights or responsibilities or with regard to any matter involving the application of legal principles to rights, duties, obligations or liabilities.

"(3) Drafting any legal document or agreement involving or affecting the legal rights of a person.

"(4) Representing any person in a court, or in a formal administrative adjudicative proceeding or other formal dispute resolution process or in any administrative adjudicative proceeding in which legal pleadings are filed or a record is established as the basis for judicial review.

"(5) Giving advice or counsel to any person, or representing or purporting to represent the interest of any person, in a transaction in which an interest in property is transferred where the advice or counsel, or the representation or purported representation, involves (a) the preparation, evaluation, or interpretation of documents related to such transaction or to implement such transaction or (b) the evaluation or interpretation of procedures to implement such transaction, where such transaction, documents, or procedures affect the legal rights, obligations, liabilities or interests of such person . . .

"(6) Engaging in any other act which may indicate an occurrence of the authorized practice of law in the state of Connecticut as established by case law, statute, ruling or other authority.

" 'Documents' includes, but is not limited to, contracts, deeds, easements, mortgages, notes, releases, satisfactions, leases, options . . . and any other papers incident to legal actions and special proceedings. . . ." Practice Book § 2-44A. Section 2-44A, in defining what constitutes the unauthorized practice of law, also provides for certain exceptions, which we discuss hereinafter.

The plaintiff contends, and we agree, that this definition of the practice of law is sufficiently capacious to encompass the various types of services that the plaintiff purports to provide under the auspices of its debt negotiation business. First, the services that the plaintiff provides bear all the external indicia of the practice of law. The plaintiff is a law firm; it purportedly enters into retainer agreements through which it expressly

purports to provide legal services; and it alleges in the present action that its Connecticut attorneys enter into attorney-client relationships with each Connecticut client. On the basis of these representations, we must conclude that the plaintiff "[holds itself] out . . . as an attorney, lawyer, counselor, advisor [or otherwise] . . . (a) qualified or capable of performing or (b) . . . engaged in the business or activity of performing any act constituting the practice of law . . . ." Practice Book § 2-44A (a) (1).

Second, the plaintiff alleges that it provides debt negotiation services in the context of "consult[ing] with each client about their legal options . . . [including providing] legal advice on topics such as the applicable statute of limitations, the advantages and disadvantages of bankruptcy, garnishment exemptions, and litigation options and strategies." This is consistent with the public comment letters received by the commissioner acknowledging that many Connecticut attorneys frequently assist their clients in negotiating mortgage, consumer, and other forms of debt in the context of providing quintessential legal services such as advice as to the enforceability of debts, defense of collection suits, and representation in bankruptcy proceedings. See also New York City Bar Report, supra, p. 77 ("[f]or many practitioners, legitimate debt settlement negotiation comprises a part of their bona fide practice of law through which clients resolve debt issues"). The plaintiff's representations, if true, thus indicate that the debt negotiation services that it provides are inseparably bound together with giving legal advice as to the transfer of property interests, preparing and evaluating related documents, and assisting with potential litigation arising from such transactions. See Practice Book § 2-44A (a) (5).

Third, the plaintiff represents that "[i]If litigation develops, the assigned Connecticut attorney assists the client in preparing answers to complaints and arbitration demands, drafts responses to discovery (if applicable), drafts cease and desist letters to creditors, and, when appropriate, helps the client assert claims against creditors who violate the law on collection practices. For an additional fee, the [plaintiff] also offers to provide bankruptcy consultations to those clients who cannot settle their debts outside of bankruptcy." Although it is not entirely clear from the complaint, it appears, based on these representations, that the plaintiff also may draft legal documents or agreements for its debt settlement clients; see Practice Book § 2-44A (a) (3); and represent those clients in court or in other formal dispute resolution processes. See Practice Book § 2-44A (a) (4). At the very least, such services would appear to qualify as "other act[s] which may indicate an occurrence of the authorized practice of law . . . ." Practice Book § 2-44A (a) (6).

The plaintiff further represents that, under its business plan, all of these legal services are provided either directly by Connecticut attorneys or by paralegals and other support staff under the direct supervision and control of Connecticut attorneys. Accordingly, taking the allegations in the complaint as true, as we must, we are compelled to conclude that the debt negotiation services that the plaintiff provides are inextricably bound together with the practice of law by licensed Connecticut attorneys. See, e.g., *Kowaleski* v. *Rabel*, Statewide Grievance Committee, Opinion No. 13-0267 (April 17, 2014) (concluding that Pennsylvania attorney who assisted Connecticut resident in debt modification and reworking of mortgage engaged in unauthorized practice of law). Accordingly, their regulation falls under the exclusive authority of the Judicial Branch. In their current form, the debt negotiation statutes therefore offend the separation of powers provision of article second of the state constitution and are unenforceable with respect to Connecticut attorneys engaged in the bona fide practice of law.[8]

Two points bear further discussion. First, we consider the commissioner's argument that debt negotiation services cannot constitute the practice of law because such services legally may be provided by nonattorneys without running afoul of General Statutes § 51-88, which prohibits the practice of law by persons not admitted as attorneys. The trial court found this argument persuasive, as have certain of our sister courts. See, e.g., *Erwin & Erwin* v. *Bronson*, 117 Or. App. 443, 446–47, 844 P.2d 269 (1992), review denied, 317 Or. 271, 858 P.2d 1313 (1993). We, however, do not.

Even if we were to assume that the commissioner's premise is true, and that nonattorneys may legally provide basic debt negotiation services in Connecticut without violating § 51-88, the conclusion does not follow that such services do not constitute the practice of law when performed *by Connecticut attorneys within the context of an attorney-client relationship*. Rather, it is well established that there are a number of services that may legally be provided by laypeople but, when performed by attorneys, constitute the practice of law. Practice Book § 2-44A, for example, contains an "[e]xceptions" section, which lists a dozen activities that are permitted to be performed by any person "[w]hether or not [they constitute] the practice of law . . . ." Practice Book § 2-44A (b). Those activities include but are not limited to: acting as an authorized representative before administrative agencies or in administrative hearings; Practice Book § 2-44A (b) (2); "[s]erving in a neutral capacity as a mediator, arbitrator, conciliator or facilitator"; Practice Book § 2-44A (b) (3); "[p]articipating in labor negotiations, arbitrations, or conciliations arising under collective bargaining rights or agreements"; Practice Book § 2-44A (b) (4); "[a]cting

as a legislative lobbyist"; Practice Book § 2-44A (b) (6); "[p]erforming statutorily authorized services as a real estate agent or broker licensed by the state of Connecticut"; Practice Book § 2-44A (b) (9); and "[p]reparing tax returns . . . ." Practice Book § 2-44A (b) (10). Section 2-44A therefore implicitly recognizes that these activities, although permissible for nonattorneys, may constitute the practice of law when performed by attorneys in the context of an attorney-client relationship. Indeed, some of these practices are "commonly understood to be the practice of law"; *Statewide Grievance Committee* v. *Patton*, 239 Conn. 251, 254, 683 A.2d 1359 (1996); and were traditionally considered to be quintessentially legal services.

The official commentary to rule 5.5 (c) (4) of the Rules of Professional Conduct likewise recognizes the existence of "services that nonlawyers may perform but that are considered the practice of law when performed by lawyers." See also *In re Darlene C.*, 247 Conn. 1, 16, 717 A.2d 1242 (1998) (*Borden, J.*, concurring) (activities such as filing papers in court may constitute practice of law when performed by attorneys but not when permissibly performed by laypeople). Accordingly, the fact that laypeople legally may perform debt negotiation services does not mean that such services do not constitute the practice of law when engaged in by a Connecticut attorney in the context of an attorney-client relationship.[9]

Second, we hasten to emphasize that our conclusion that the commissioner lacks the constitutional authority to license and regulate the provision of debt negotiation services as characterized by the plaintiff is predicated on the plaintiff's representation that its employees and affiliates provide such services to Connecticut residents only (1) under the direct supervision and control of licensed Connecticut attorneys, pursuant to rules 5.3 and 5.5 of the Rules of Professional Conduct, and (2) only in conjunction with the bona fide practice of law. If the commissioner were to determine, however, that, in a particular case, the plaintiff or another debt negotiation company was merely using Connecticut attorneys as a front or facade to circumvent the debt negotiation statutes, then there would be no separation of powers problem and the commissioner would not be barred from exercising his full statutory authority. The plaintiff itself appears to concede this point, and our sister courts have concluded likewise. See, e.g., *In re Kinderknecht*, supra, 470 B.R. 172; see also New York City Bar Report, supra, p. 3 ("[t]o the extent attorneys engaged in these enterprises are not acting as attorneys, their conduct would fall outside the scope of the Rules of Professional Conduct and should therefore be included in the statutory scheme").

Although the separation of powers provision of the state constitution requires that the commissioner pre-

sume, for the purposes of § 36a-671c, that a Connecticut attorney who purports to provide debt negotiation services within the context of an attorney-client relationship is actually engaged in the practice of law, that presumption may be overcome where, for example, the commissioner determines that the Connecticut attorney has failed to (1) exercise meaningful oversight over debt negotiation staff, (2) provide any genuine legal advice or other legal services, and/or (3) maintain a bona fide attorney-client relationship with the client. In such cases, the person or persons providing debt negotiation services would not qualify for the attorney exemption.

Finally, we note that the Office of Chief Disciplinary Counsel is well aware of its duty to regulate lawyers when they are acting as debt negotiators, and we trust that it will continue to monitor vigilantly their activities and fees in this area of practice. We expect that that office, if asked to pass upon the fees charged by the plaintiff or other debt negotiation companies, will take the statutory fee cap and the commissioner's maximum fee schedule into consideration in determining whether the fees charged are reasonable. We likewise trust that Connecticut attorneys, both newly admitted and experienced, will remain mindful of the potential ethical pitfalls they may encounter in this area of practice.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment sustaining the plaintiff's appeal.

In this opinion the other justices concurred.

[1] The debt negotiation statutes were amended since the plaintiff initiated this declaratory judgment action in 2012; see, e.g., Public Acts 2014, Nos. 14-7, 14-89 and 14-122; however, the changes are not relevant to this appeal. For the sake of convenience and clarity, we refer to the current revision of the statutes.

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Article second of the constitution of Connecticut, as amended by article eighteen of the amendments, provides in relevant part: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. . . ."

[4] Pursuant to this authority, the commissioner has established a schedule of maximum debt negotiation fees. See Connecticut Dept. of Banking, "Debt Negotiation: Schedule of Maximum Fees," (last modified September 28, 2009), available at http:///www.ct.gov/dob/cwp/view.asp?a=2232&q=447776 (last visited August 27, 2015). The schedule provides, among other things, that: (1) an initial debt negotiation set-up fee may not exceed $50; (2) a monthly service fee may not exceed $8 per creditor and $40 total; and (3) total aggregate fees may not exceed 10 percent of the amount by which a consumer's debt is reduced as part of each settlement. Id.

[5] See Association of the Bar of the City of New York, "Profiteering from Financial Distress: An Examination of the Debt Settlement Industry" (May 2012) Appendix E, pp. 171–84 (New York City Bar Report) (chart depicting current state regulations).

[6] The commissioner did not determine either (1) whether the plaintiff's business model for providing debt negotiation and related services would qualify for the attorney exemption under the commissioner's "primary purpose" test, or (2) whether § 36a-671c violated the separation of powers provisions of the state constitution.

[7] Ordinarily, it is the practice of this court to resolve all of an appellant's statutory and administrative claims before considering any constitutional challenges. We have made exception to that rule, however, when "sufficient public interest warrants such a review"; *State* v. *DellaCamera*, 166 Conn. 557, 561, 353 A.2d 750 (1974); and when the appellant's constitutional challenge is clearly meritorious. See, e.g., *Leydon* v. *Greenwich*, 257 Conn. 318, 333 n.20, 777 A.2d 552 (2001) (concluding that challenged ordinance violated federal and state constitutional rights to engage in protected expressive and associational activities, rather than addressing merits of Appellate Court's determination that ordinance violated state common-law doctrine governing municipal parks). We conclude that both conditions are satisfied here, and we therefore resolve this appeal on the constitutional issue. Cf. *Heiberger* v. *Clark*, 148 Conn. 177, 184, 191, 169 A.2d 652 (1961) (reaching question whether statute that abridged qualifications for admission to Connecticut bar for attorneys admitted to practice in other states violated separation of powers, despite procedural defects in appeal, because matter was one of great public importance).

[8] The commissioner has directed our attention to several cases in which sister courts considering similar challenges have reached contrary conclusions. See, e.g., *Brown* v. *Consumer Law Associates*, *LLC*, 283 F.R.D. 602, 609 (E.D. Wash. 2012); *Hays* v. *Ruther*, 298 Kan. 402, 411, 313 P.3d 782 (2013); *Eric M. Berman*, *P.C.* v. *New York*, 2015 N.Y. Slip Op. 05594, 2015 WL 3948182 (N.Y. June 30, 2015). Those cases are factually distinguishable, however, or employ reasoning with which we disagree. For example, the New York Court of Appeals relied on the fact that the debt collection practices at issue did *not* constitute the practice of law and, in fact, the local law itself "clearly states that it does not pertain to attorneys who are engaged in the practice of law on behalf of a particular client." *Eric M. Berman*, *P.C.* v. *New York*, supra, *4. In the present case, by contrast, we have concluded that debt negotiation, as characterized by the plaintiff, does constitute the practice of law when performed by an attorney.

[9] The commissioner's reliance on *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 6 A.3d 726 (2010), is misplaced. In that case we addressed the inverse question, namely, whether the mere fact that an attorney engages in certain conduct thereby renders it the practice of law. In concluding that conduct in which an attorney engages outside the context of an attorney-client relationship does not constitute the practice of law, we did not address the issue of whether an attorney may, as part of the practice of law, engage in conduct that would not qualify as the practice of law if performed by a layperson. Indeed, in *Bysiewicz*, we observed that nonattorneys historically were permitted to engage in various conduct that was "commonly understood to be the practice of law" when performed by attorneys. (Internal quotation marks omitted.) Id., 768.